# United States Court of Appeals
## For the First Circuit

Nos. 12-1610, 13-1263

UNITED STATES OF AMERICA,

Appellee,

v.

CRUZ ROBERTO RAMOS-GONZÁLEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges
and Gelpí,* District Judge.

Linda Backiel for appellant.
Dina Ávila-Jiménez, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Juan Carlos Reyes-Ramos, Assistant United States Attorney, were on brief, for appellee.

January 6, 2015

---

*Of the District of Puerto Rico, sitting by designation.

**LIPEZ, Circuit Judge**. Appellant Cruz Roberto Ramos-González ("Ramos") was tried a second time on a drug trafficking charge after this court concluded that his Sixth Amendment right to confrontation had been violated at his first trial. See United States v. Ramos-González, 664 F.3d 1, 2 (1st Cir. 2011). Ramos was again convicted of possessing more than 500 grams of cocaine with the intent to distribute the narcotic. He now raises numerous challenges to that second conviction and the resulting 327-month sentence. Although we find no reversible trial error, we conclude that a remand for resentencing is necessary. In designating Ramos as a career offender under the Sentencing Guidelines, the district court relied on a predicate offense that does not -- on the record before us -- qualify for that purpose. Hence, Ramos must be resentenced without the career offender enhancement.

## I.

### A. Factual Background

The facts of the crime, as the jury could have found them, are as follows. On July 4, 2002, two Puerto Rico police officers on traffic duty attempted to stop a red pickup truck owned by Ramos because the vehicle's windows were tinted darker than permitted by law. The driver ignored the police car's siren and flashing lights and sped away, with the officers, Javier Reyes-Flores ("Reyes"), and Wanda Vélez-Mojica ("Vélez), in pursuit. The truck soon crashed, and the driver exited the vehicle. After

-2-

briefly looking at Reyes and raising his arms, the driver turned and fled. Although Reyes pursued him over a fence, the driver successfully avoided capture.

Meanwhile, back at the now-abandoned truck, Vélez had found two plastic-wrapped blocks, subsequently determined to be cocaine, on the driver's side floor. Among the other items found in the vehicle were $1,068 in cash, traffic tickets issued to Ramos, his Social Security card, plastic bags holding eighteen bullets, some cellular phones, and two forms of identification with photos of Ramos -- his driver's license and electoral card. Based on the photos, Reyes identified Ramos as the driver who had fled. Reyes also recognized Ramos as the same individual whom he had seen on two other recent occasions when he was investigating a motorcycle accident.[1]

## B. Procedural Background

Ramos was initially prosecuted on drug charges by Puerto Rico authorities, but the commonwealth proceedings ended at the preliminary hearing stage with a finding of no probable cause. In June 2007, about a week before the statute of limitations would have expired on the 2002 episode, federal authorities filed an indictment charging appellant with one count of possession with intent to distribute more than 500 grams of cocaine. See 21 U.S.C.

---

[1] Both times, Reyes saw Ramos accompanying the mother of a young man who was injured in the accident.

§ 841(a)(1). Appellant eluded arrest for two years, until April 2009, when he was taken into custody in the Dominican Republic. Later that year, a jury found appellant guilty of the drug trafficking crime, and he was sentenced to 327 months in prison. This court vacated that conviction because of a violation of appellant's Sixth Amendment right to confrontation, which occurred when a chemist was allowed to testify about the results of a drug analysis that he did not perform. See Ramos-González, 664 F.3d at 2.

Appellant was retried in early 2012. At that second trial, he offered a new alibi defense: he had been at the beach with several people, including the mother of one of his children, on the day of the high-speed chase in 2002. In addition, he presented a witness who identified someone else -- the witness's brother, now deceased -- as the driver of Ramos's truck that day. The jury nonetheless again found appellant guilty of the drug possession charge.

At sentencing, the district court treated appellant as a career offender based on two prior convictions under Puerto Rico law. See U.S.S.G. § 4B1.1(a).[2] One of the prior crimes -- a 1991 conviction for first-degree murder -- undisputedly qualifies as a

---

[2] Section 4B1.1(a) applies career offender status to a defendant, age eighteen or older, who commits a felony that is either a crime of violence or a drug offense, and who "has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

predicate offense for career offender purposes.  The other qualifying conviction was based on a paragraph in appellant's Presentence Report ("PSR") listing a 1987 charge under Article 256 of the Puerto Rico Penal Code, which criminalized the "use[] [of] violence or intimidation against a public official or employee." See P.R. Laws Ann. tit. 33, § 4491 (1998).[3]  The paragraph also included under the same date the notation "Dist. Cont. Substances," evidently describing a drug crime (i.e., distributing controlled substances).  In explaining this conviction, the PSR states: "According to the judicial documents, on November 15, 1986, the defendant possessed with the intent to distribute 2.68 grams of cocaine.  He further resisted the arrest by pushing and grabbing one PRPD officer."  The district court rejected appellant's objection that the supporting documents were not "official."

The court's use of the career offender classification resulted in a Base Offense Level ("BOL") of 34 and a Criminal

---

[3] Puerto Rico's Penal Code was revised in 2004 and 2012, and the current version of this provision is now codified as § 5335. The earlier version of the statute provided, in relevant part:

> Any person who uses violence or intimidation against a public official or employee to compel him/her to perform an act contrary to his/her duties or to omit an act inherent to his/her office, or who, by the use of violence or intimidation, offers resistance to said official or employee in the performance of his/her duties, shall be punished by [imprisonment or a fine, or both].

P.R. Laws Ann. tit. 33, § 4491 (1998).

History Category ("CHC") of VI, with a Guidelines sentencing range of 262 to 327 months.  Without career offender status, appellant would have had a BOL of 30 and a CHC of V, with a Guidelines range of 151 to 188 months.  The district court imposed the high end of the higher range, 327 months.

On appeal, Ramos asserts that his conviction must be vacated and his indictment dismissed because he was denied due process by the federal authorities' pre-indictment delay.  He also argues that the district court made multiple errors at trial, including refusal to allow an alibi witness, rejecting a missing witness instruction, and misleading the jury with its instructions on possession.  He further claims that his sentence is both erroneously calculated and unreasonably harsh.  Finally, he maintains that the court should have dismissed the case against him because of government misconduct.[4]

## II.

We turn first to Ramos's claims relating to his conviction, beginning with the two asserted problems that Ramos says require dismissal of the charge against him.

---

[4] The misconduct claim was asserted in a post-trial motion that was submitted in April 2012 and denied in February 2013.  A separate appeal of that denial (No. 13-1263) was subsequently consolidated with the previously filed appeal of the conviction and sentence (No. 12-1610).  This opinion therefore addresses both appeals.

## A. Pre-indictment Delay

Shortly after this court vacated Ramos's original conviction and remanded the case to the district court, Ramos filed a renewed motion to dismiss the indictment on the ground that the government's delay in filing the drug trafficking charge violated his due process rights.  He emphasized that the indictment had been brought a week before the five-year limitations period would have barred his prosecution, and the second trial would occur more than nine years after the events at issue.  Ramos complained that the passage of time had eroded his ability to mount a vigorous defense because of dimmed memories and the loss of witnesses and evidence.

The district court denied the motion with a docket order, and we review that decision for abuse of discretion, United States v. Bater, 594 F.3d 51, 53 (1st Cir. 2010).[5]  We have observed that "excessive pre-indictment delay can sometimes, albeit rarely, violate the Fifth Amendment's Due Process Clause if the defendant shows both that the 'delay caused substantial prejudice to his right to a fair trial' and that 'the [g]overnment intentionally delayed indictment . . . to gain a tactical advantage.'" Id. at 54 (quoting United States v. Picciandra, 788 F.2d 39, 42 (1st Cir.

---

[5] As we noted in Bater, some matters subject to the abuse-of-discretion standard will encompass subsidiary issues of fact -- "for which clear error is the customary test" -- or "mistakes on abstract issues of law [that are] reviewed de novo."  594 F.3d at 54 n.1.

1986)) (alteration and omission in original); see also United States v. Marion, 404 U.S. 307, 325 (1971).

In asserting prejudice, Ramos claims that he was denied the opportunity to present the testimony of José Néris Rodríguez ("José Néris"), who Ramos maintains was the driver involved in the high-speed chase and who died in 2006, while the government was able to take advantage of the delay by asking each testifying defense witness why he or she had waited so long to come forward with their exculpatory testimony.[6] Ramos also claims prejudice in the disappearance of "two critical sources of identification evidence": a pair of flip-flops found near the abandoned red truck and a fanny pack belonging to José Néris that he claims was in the truck. He cites as well the loss of recordings made at the preliminary hearing in commonwealth court, which he describes as "invaluable tools" to confront Officer Reyes about his inability to identify Ramos as the driver shortly after the events.

The government offers rejoinders to each of these claimed disadvantages, emphasizing that most depend on "rank conjecture" -- particularly Ramos's assumption that José Néris would have implicated himself as the driver of the truck and, hence, possessor of the cocaine. The government also challenges Ramos's assertion that a fanny pack belonging to Néris was found in the vehicle,

---

[6] Ramos points in particular to the questioning of José Néris's brother, Héctor; Gerardo Cruz, a bystander to the chase; and Johanna Bermúdez, his child's mother.

noting that such an item does not appear on any inventory list, and it asserts that the sharp cross-examination of defense witnesses resulted not from the passage of time but from the witnesses' failure to inform investigators early on of their supposed knowledge of the events. Moreover, the government notes that Ramos was able to present his alibi defense through witnesses other than José Néris, "even if not to the full extent he desired." United States v. DeCologero, 530 F.3d 36, 78 (1st Cir. 2008).

We need not dwell on the issue of prejudice, however, because we find no evidence that the government purposefully delayed the indictment to gain a tactical advantage at trial. Ramos urges us to find sinister motive in the government's decision to bring this case on the eve of a separate 47-defendant, ten-count indictment alleging that he was the kingpin of a multi-year drug trafficking conspiracy. Trial in the conspiracy case originally was set for mid-August 2009, two weeks before the trial in this case,[7] and Ramos argues that the nearly simultaneous prosecutions were problematic for him and advantageous for the government. Ramos claims he felt pressure to plead guilty in one of the cases, and he asserts that a resolution in one case would "virtually preclude his exercising his right to testify in the second."[8]

_____

[7] The conspiracy trial eventually began in mid-October 2009, less than a month after the trial in this case.

[8] Ramos's original conviction in the case now before us occurred on September 25, 2009, and he was convicted on six counts

-9-

Although the back-to-back trial schedule was no doubt difficult for Ramos, we see no evidence that the timing was orchestrated by the government for the purpose of imposing that burden. Indeed, the government could not have known that the complex multi-defendant case would be set for trial at the same time as this single-count prosecution against only Ramos.[9] The government attributes the length of the delay to the case's transfer from commonwealth court to federal court, followed by the case's shifting assignment among prosecutors. At oral argument, government counsel explained that, in her role as lead prosecutor in the conspiracy investigation, she was alerted to this case and discovered that the statute of limitations was about to expire. She therefore "tried to move as quickly as possible" in securing an indictment.

Ramos has offered no reason for us to discredit the government's plausible explanation and, hence, no basis for us to conclude that the district court abused its discretion in denying his motion to dismiss for pre-indictment delay. As we have

_____

in the conspiracy case on November 3, 2009. In the conspiracy case, he was sentenced in April 2012 to life terms on five counts and a concurrent 240-month sentence on another count, all of which are to be served concurrently with the sentence in this case. An appeal is pending in the conspiracy case.

[9] Although the original indictments were issued in close succession -- in June 2007 for the instant case and in August 2007 for the conspiracy case -- a superseding indictment was issued in the conspiracy case in February 2008, and a superseding indictment was issued in this case more than a year later, in May 2009.

observed, "[t]he Due Process Clause has only a limited role in this context because the statutes of limitations provide the primary protection against undue pre-indictment delays." DeCologero, 530 F.3d at 78. Although there may be instances when prosecutorial delay will be sufficiently egregious to support a due process violation even absent tactical purpose, this is not such a case. See United States v. Lovasco, 431 U.S. 783, 795 n.17 (1977) (noting the government's concession that due process might be violated by delay "incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense" (internal quotation marks omitted)).

**B. Government Misconduct**

Three days before the retrial in this case, the government provided Ramos with FBI reports ("302 Reports") recounting interviews that had been conducted in 2006 and 2007 with the two officers, Reyes and Vélez, who had been involved in the 2002 vehicle chase. The content of Reyes's interviews was consistent with his testimony at the first trial, but the 302 reports of Vélez's statements revealed conflicts with her trial testimony. In particular, one 302 Report stated that Vélez had said she "did not see the driver's face during or after the chase," while at trial she testified that she noticed Ramos's "light-colored eyes." Ramos moved to exclude Vélez as a government

-11-

witness at the second trial because of the inconsistencies, but following that motion neither the government nor the defense sought to call Vélez to testify.[10]

After Ramos was convicted and sentenced for the second time, he moved to dismiss the indictment for prosecutorial misconduct. In the portion of the motion most pertinent here, he complained that the government had intentionally concealed material evidence -- the 302 reports of Vélez's interviews -- that would have revealed her false testimony at the first trial. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that, upon request, prosecution must turn over to the defense favorable evidence that is material to guilt or punishment); United States v. Bagley, 473 U.S. 667, 676 (1985) (holding that the duty to disclose extends to impeachment evidence); United States v. Acosta-Colón, 741 F.3d 179, 195 (1st Cir. 2013) (explaining that one type of Brady violation occurs when "undisclosed evidence shows that prosecutors knowingly used perjured testimony or allowed false testimony to go uncorrected"). In addition, the motion charged a "recurrent pattern of concealment and deception," citing the same prosecutor's belated disclosure of evidence in the contemporaneous conspiracy

---

[10] The government explained that it acquiesced to defense counsel's motion that Vélez be precluded as a witness because "we had given him the 302 last Friday, and it wouldn't be fair for him to cross-examine her so late. So that's why we left her out, conceding to his motion."

case in which Ramos also was a defendant.[11]  Ramos argued that dismissal of the indictment was the appropriate sanction for persistent government conduct "undertaken with such flagrant disregard for Mr. Ramos-Gonzalez's constitutional rights."

In considering the motion, the district court addressed both the alleged misconduct in this case (the possession case) -- allowing Vélez to testify falsely at Ramos's first trial -- and the alleged withholding of evidence in the separate, 47-defendant conspiracy case.  With respect to the possession case, the court found no prejudice because Vélez did not testify at the second trial: "[A]ny error her conflicting testimony may have originally introduced was cured in this subsequent and new trial."  United States v. Ramos-González, No. 3:07-cr-00262-JAF, Memorandum and Order (D.P.R. Feb. 1, 2013), at 5 ("Memorandum and Order").  As for the government's allegedly improper actions in the conspiracy prosecution, the court looked to a decision issued in that case on the defendants' motion for a new trial.  In rejecting a Brady claim based on some of the same allegations of misconduct, a different trial judge had concluded that the undisclosed documents were either cumulative or collateral impeachment evidence, United States

_____

[11]  The motion asserted that in the conspiracy case the government had, inter alia, improperly withheld information about benefits provided to the government's "star witness," Harry Smith Delgado-Cañuelas ("Delgado"), who was a cooperating co-defendant, and belatedly provided copies of notes Delgado made memorializing his conversations with other defendants.

v. Ramos-González, 747 F. Supp. 2d 280, 294 (D.P.R. 2010), and that the prosecutor had not withheld evidence in bad faith, id. at 288. The court in this case adopted and reaffirmed that assessment of the government's actions in the conspiracy trial: "The government neither committed a Brady violation nor engaged in prosecutorial misconduct when it produced materials to the defense post-trial." Memorandum and Order, at 4 (citing Ramos-González, 747 F. Supp. 2d at 294; United States v. Ramos-González, No. 07-318, 2011 WL 2144215, at *2 (D.P.R. May 31, 2011)). Concluding that Ramos suffered no prejudice in either the conspiracy trial or the possession retrial, the court denied the motion to dismiss.

A district court's decision to deny a motion to dismiss based on prosecutorial misconduct is reviewed for abuse of discretion. United States v. Dancy, 640 F.3d 455, 463 (1st Cir. 2011).[12] We previously have recognized that, given "the constitutionally mandated independence of the grand jury and the prosecutor, courts should be reluctant to dismiss an indictment." United States v. Rivera-Santiago, 872 F.2d 1073, 1088 (1st Cir. 1989) (internal quotation marks omitted). Moreover, once a defendant has been convicted, the sanction of dismissing an indictment "is employed in only truly extreme cases of egregious

---

[12] The government argues that this issue was not adequately preserved and that, accordingly, we should apply plain error review. Because the claim does not succeed even under the standard for preserved error, we need not, and do not, consider its timeliness.

prosecutorial misconduct," id. (internal quotation marks omitted), and only where the misconduct "'so poisoned the well' that it likely affected the outcome of the trial," Dancy, 640 F.3d at 463 (quoting United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007)).

We are satisfied that the district court did not abuse its discretion in refusing to dismiss the indictment here. The unrevealed inconsistency in Vélez's statements relates to impeachment rather than innocence. Moreover, the undisclosed reports also differed on the disputed fact. The FBI 302 Report in which Vélez is quoted as saying she did not see the driver's face -- a statement inconsistent with her trial testimony -- is dated June 25, 2007. However, in a report prepared eighteen months earlier, in January 2006, she described the driver as she had at trial as having "light colored eyes." The later report notes that Vélez "opened the interview by stating that she did not have her notes of an incident which occurred on July 4, 2002" and that she "attempted to provide the facts of that incident as well as she could from memory." The discrepancies between the two FBI reports, together with the disclaimer in the second report suggesting that the earlier one may be more accurate, inevitably would have reduced the impact of the inconsistency between Vélez's trial testimony and the June 2007 report. Moreover, although the disclosure should have come earlier, the government provided the reports before the

-15-

retrial began. In these circumstances, the district court supportably concluded that the government's nondisclosure and its use of Vélez's testimony in the first trial was not an extreme case of prosecutorial misconduct. See Rivera-Santiago, 872 F.2d at 1088.

In addition, as the district court recognized, any prejudice arising from the failure to disclose Vélez's conflicting reports did not recur at the second trial because the government did not call her as a witness. Nonetheless, Vélez remained available, and if Ramos's counsel had thought it useful to reveal the inconsistencies in her statements, she could have been called as a defense witness.[13]

Nor can we conclude that the district court abused its discretion in rejecting the motion to dismiss based on the government's cumulative conduct in Ramos's two independent cases. As an initial matter, the district court in the conspiracy case

---

[13] In passing, Ramos also complains that the FBI 302 reports reveal an inconsistency involving Vélez's testimony in the first trial that, before the car chase, she had seen Ramos in her neighborhood bringing vehicles to "a kid who washes cars." In the 2007 FBI 302, Vélez stated that she had never seen the person she knew by reputation as "Robert Belleza" -- a name used by Ramos -- before the car chase. That report and her testimony are not necessarily inconsistent. Vélez testified that she first connected the person in her neighborhood with Ramos/Belleza during the post-chase investigation. Her 302 statement may be understood, consistently, to report that she had never previously associated the familiar face with the also familiar name. In any event, the offending evidence was not introduced at the second trial, and Ramos could have, but did not, call Vélez as a witness to exploit any such inconsistency.

took the defendants' <u>Brady</u> claims seriously, conducted an evidentiary hearing, and wrote a thoughtful opinion explaining why the alleged violations there did not warrant a new trial. <u>See</u> <u>Ramos-González</u>, 747 F. Supp. 2d at 291-97.[14]  Given such careful treatment, that court's judgment that no constitutional violation occurred in the trial over which it presided is owed deference by both the district court in the instant case and by us on appeal. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Mathur</u>, 624 F.3d 498, 504 (1st Cir. 2010) (noting that the trial court's "views about the likely impact of newly disclosed evidence deserve considerable deference" because "[t]he trial judge, having seen and heard the witnesses at first hand, has a special sense 'of the ebb and flow of the recently concluded trial'" (quoting <u>United States</u> v. <u>Natanel</u>, 938 F.2d 302, 313 (1st Cir. 1991)).  In addition, we already have described the limited significance of the cited nondisclosures in this case. Hence, even taking the government's failures in combination, the district court could properly conclude that dismissal was unwarranted.[15]

---

[14] The court in the conspiracy case also subsequently denied Ramos's motion to dismiss the indictment in that case based on the same failure by the prosecution to turn over the evidence. <u>See</u> <u>Ramos-González</u>, 2011 WL 2144215, at *1; <u>see</u> <u>also</u> <u>supra</u> note 11.

[15] We add two brief comments on this claim.  First, we reject Ramos's contention that the district court committed reversible error in refusing to hold an evidentiary hearing.  As noted above, a hearing was held in the conspiracy case. Only limited additional government behavior was challenged here, and the court thus acted within its discretion in concluding that another hearing was

Though we find no error in the district court's resolution of the prosecutorial misconduct claim, and no basis for finding bad faith by the prosecutors in these cases, we nonetheless express concern about the repeated nondisclosure of evidence. As noted above, impeachment evidence, as well as exculpatory evidence, is covered by the principles of Brady and related cases. See e.g., Drumgold v. Callahan, 707 F.3d 28, 38 (1st Cir. 2013); Acosta-Colón, 741 F.3d at 195. Morever, prosecutors in every case -- even in a district with a burdensome and congested criminal docket, such as Puerto Rico -- have a duty to learn of evidence favorable to the accused that is "known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). The United States Attorney's Office should develop procedures to avoid repeating the lapses that occurred in these cases.

---

unnecessary.

Second, Ramos's motion to dismiss also complained that the government had violated his Sixth Amendment right to counsel of choice by investigating whether his attorney helped fabricate his alibi defense, thereby intimidating counsel and "establish[ing] a per se and actual conflict of interest by placing Counsel's interests at odds with the Defendant's." That post-trial investigation could not have contributed, however, to the jury's verdict of guilt, and it therefore does not assist Ramos's effort to show prejudice. Moreover, this claim was referenced only in passing on appeal and, hence, is waived. See, e.g., United States v. Martinez, 762 F.3d 127, 132 n.2 (1st Cir. 2014).

## C. Exclusion of Alibi Witness

Ramos argues that the district court violated his constitutional right to present witnesses in his defense when it refused to allow an alibi witness that Ramos did not disclose to the government until he sought to call her on the third day of trial.  See generally Taylor v. Illinois, 484 U.S. 400, 402 & n.1 (1988) (noting the accused's right under the Sixth Amendment's Compulsory Process Clause "to obtain the testimony of favorable witnesses"); United States v. Portela, 167 F.3d 687, 705 (1st Cir. 1999) (same).  We review this claim de novo, balancing the defendant's right to present his defense with "[t]he State's interest in the orderly conduct of a criminal trial."  Taylor, 484 U.S. at  411.  Among the "countervailing public interests" are "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process."  Id. at 414-15.  Even if constitutional error occurred, it may be found harmless if the prosecution is able to prove beyond a reasonable doubt that the error did not contribute to the verdict.  Portela, 167 F.3d at 706 (citing Satterwhite v. Texas, 486 U.S. 249, 256 (1988)).

Under Federal Rule of Criminal Procedure 12.1, if the government requests notice of the defendant's intent to offer an

alibi defense, the defendant must respond in writing with the names of each alibi witness on whom he intends to rely.  Fed. R. Crim. P. 12.1(a)(1), (2).  The Supreme Court has observed that rules providing for pretrial discovery of an opponent's witnesses "minimize[] the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony." Taylor, 484 U.S. at 411-12.  Here, the government made a request under Rule 12.1(a)(1), and Ramos notified the government that he would present testimony that he was at the beach with "friends and family members" on July 4, 2002, the day of the chase.  He identified his alibi witness as Johanna Bermúdez, his then-mistress and the mother of one of his children, and he reported that Bermúdez was accompanied to the beach that day by "her daughter and Mrs. Rosa López."

At trial, after Bermúdez testified that Ramos spent most of July 4 with her and others, Ramos sought to call López's daughter, Kiomarie Hernández-López ("Hernández"), as a corroborating witness.  Defense counsel explained that Hernández was being called because her mother, Rosa López, "doesn't want to get involved in court."  The government objected on the ground that Hernández had not been named as an intended alibi witness and that, indeed, López had not been identified as a witness either.  The court sustained the government's objection, pointing out that Rule 12.1 required Ramos to provide the name, address, and telephone

number of each alibi witness.  Defense counsel did not press the issue.

On appeal, Ramos does not dispute that he violated Rule 12.1(a)(2).  Rather, he argues that the district court committed constitutional error by failing to weigh his right to present the proposed witness against "the integrity of the adversary process," Taylor, 484 U.S. at 414, and by unjustifiably disregarding the Supreme Court's statement that sanctions other than preclusion "would be 'adequate and appropriate'" for most discovery violations, Michigan v. Lucas, 500 U.S. 145, 152 (1991) (quoting Taylor, 484 U.S. at 413).  See Taylor, 484 U.S. at 413 (noting the availability of "less drastic sanction[s]," including granting a continuance to provide time for further investigation).

As an initial matter, we note that defense counsel did not contemporaneously protest the exclusion,[16] giving the court

---

[16] After the government objected to the witness, defense counsel stated that he did not think he needed to provide "all the names of the people that I am going to present."  In response, the district court reviewed aloud Rule 12.1's requirement that the defendant give the government the name, address and telephone number of each alibi witness.  The following exchange then took place:

DEFENSE COUNSEL: However, it does say that, but I said, I told the government the address.
COURT: Counsel, you have not given her that information.
DEFENSE COUNSEL: I did not give her the name.
COURT: Objection sustained.
DEFENSE COUNSEL: Okay.
COURT: Do you have any other witnesses aside from that?
DEFENSE COUNSEL: No, sir.

-21-

little reason to consider a less severe sanction for Ramos's admitted rule violation. Although Ramos now argues that a corroborating alibi witness was essential to his case because Bermúdez was "an easy target for impeachment on grounds of bias," the only justification offered at trial for presenting Hernández as a surprise witness was that she was a substitute for another unannounced witness who had declined to appear. Importantly, having proffered the alibi through Bermúdez, supported by Héctor Néris's testimony that his brother was the truck driver, Ramos was not denied the opportunity to present his defense. Cf., e.g., United States v. Levy-Cordero, 67 F.3d 1002, 1014-15 (1st Cir. 1995) (finding exclusion of alibi evidence unjustified and remanding for a hearing to evaluate its content and reliability); Bowling v. Vose, 3 F.3d 559, 562 (1st Cir. 1993) (finding error where "an exculpatory and potentially reliable alibi" was wholly excluded).

All told, this issue is not a close call. Without any apparent justification for doing so, and in the course of presenting a newly unveiled alibi, Ramos ignored the federal notice rule whose purposes include "minimiz[ing] the risk that fabricated testimony will be believed." Taylor, 484 U.S. at 413; see also Chappee v. Vose, 843 F.2d 25, 31 (1st Cir. 1988) (observing that a

_____

The defense then rested. Both parties treat the issue as properly preserved, and we therefore do likewise.

"court may reasonably 'presume that there is something suspect about a defense witness who is not identified until after the eleventh hour has passed'" (quoting Taylor, 484 U.S. at 414)). Indeed, Ramos did not even mention Hernández in his Rule 12.1 notice reporting that her mother was at the beach with Bermúdez and Bermúdez's daughter. That omission magnified the government's surprise at trial and presumably was easy to avoid. See Taylor, 484 U.S. at 415 (noting that the "simplicity of compliance with the discovery rule is . . . relevant" in determining the proper sanction for a violation). Finally, because the alibi first appeared in Ramos's second trial, and that delay was emphasized by the government, see supra Section II.A, the proposed corroborating testimony was unlikely to be compelling even if the jurors did not consider it unbelievable.[17]

We therefore conclude that the district court's exclusion of Kiomarie Hernández's testimony was not constitutional error.

**D. Jury Instructions**

Ramos challenges the district court's jury instructions on multiple grounds. In evaluating preserved claims of instructional error, we consider de novo whether an instruction properly conveyed the governing law, and we review for abuse of discretion the district court's choice of language to present that

---

[17] The district court concluded that the alibi was "a made up defense" based on its assessment of witness credibility.

law.  See, e.g., United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012).  Whatever the nature of the asserted error, we examine the challenged instruction in context to determine "whether the charge in its entirety . . . presented the relevant issues to the jury fairly and adequately."  United States v. Stefanik, 674 F.3d 71, 76 (1st Cir. 2012).  Even an incorrect instruction will not warrant reversal if it was harmless.  United States v. McDonough, 727 F.3d 143, 157 (1st Cir. 2013) (internal quotation marks omitted).  If the defendant did not object to the challenged instruction at trial, we review only for plain error.  United States v. Appolon, 695 F.3d 44, 65 (1st Cir. 2012).

### 1.  Instruction on Constructive and Joint Possession

Ramos contends that the court's instructions on possession allowed the jury to find him guilty based on two incorrect theories: simply because he owned the vehicle where the cocaine was found, or because he jointly possessed the cocaine with Néris.  Ramos asserts that the first theory relies on an error of law and the second is unsupported by the facts.

The court initially instructed on possession as follows:

The term possessing means to exercise authority, dominion or control over something, and the law recognizes several kinds of possession.

Possession can be actual or constructive.  Actual possession is when someone has in his person direct physical control of something or so close to him or her that he is then in actual possession of it.

-24-

A person who is not in actual possession of something but who has both the power and the intention to eventually obtain possession of something is in constructive possession of that. Whenever I use the term possession, I am referring to both kinds, actual and constructive. . . .

A good example of constructive possession would be what is right now in the trunk of my car parked in the parking lot, what I have at home, in my closet, may have in my locker room, in the drawers of my desk. I'm in constructive possession of that stuff, and I am perhaps miles away from it right now. So you have actual and constructive possession and both meet the rule.

And then you have sole possession and joint possession. Sole possession is one person only having it. Joint is shared possession, two or more people sharing the possession. So all kinds of possession are included in the description of distribution of a controlled substance.

Immediately after the charge, defense counsel expressed concern that the example used in the constructive possession instruction could be misleading because it suggested that the owner of a vehicle may be held responsible for items in the trunk of his car, "even miles away," regardless of his knowledge of the trunk's contents. Counsel asked the court to stress that both types of possession must be knowing and willful. In refusing to do so, the court stated its belief that the knowledge element had been "amply explained."[18]

---

[18] The court's instructions just before the possession explanation included the following:

Subsequently, during deliberations, the jurors asked the court to "send" them the definitions of "actual possession" and "constructive possession." The jury was brought into the courtroom, and the trial judge reiterated its instruction, including the definition of "joint possession." At the request of defense counsel, however, it did not repeat the trunk-of-the-car example. In addition, counsel again asked the court to add a specific instruction on the state-of-mind requirement, and this time the court did so:

> Of course counsel and the Assistant remind me that I should always say that both possessions should be knowingly and willfully, with intention of course.

The court also provided the jurors with a copy of the possession instruction "from the book," presumably referring to the court's compilation of the applicable pattern jury instructions. See Pattern Criminal Jury Instructions for the District Courts of the First Circuit ("Pattern Instructions"), http://www.med.uscourts.gov/pdf/crpjilinks.pdf (2014).

---

For you to find the defendant guilty of this crime, you must be convinced that the Government has proven each of these things beyond a reasonable doubt. First, that the defendant on that date, July 4, 2002, possessed cocaine, either actually or constructively. Second, that he did so with a specific intent to distribute the cocaine over which he had actual or constructive possession. And third, that he did so knowingly and intentionally, which is what I just explained to you.

-26-

The next day, the jurors asked for a definition of "reasonable doubt" and "a brief refresh of the definition of knowingly and intentionally." In responding to the query on knowledge and intent, the court emphasized that the drug offense in this case required proof of criminal intent, and then elaborated, in substantial part, as follows:

> [O]ne of the things the Government has to prove is criminal intent, that is, that the defendant acted knowingly, willfully and unlawfully, and that means with a bad purpose to disobey or disregard the law, and not because of mistake, not because of accident and not because of an innocent reason.
> The idea is that there be evidence, proof beyond a reasonable doubt to prove that intent, excluding the possibility that there was a mistake, accident, or an innocent reason. That's basically it. Doing something that the law forbids, with a bad purpose to disobey or disregard the law, that is what you refer to as criminal intent, that's all, it's as simple as that, excluding mistake, accident or other innocent reason. There is no other way to describe it.

On appeal, Ramos again complains that the court's use of the car-trunk example in its initial instruction on constructive possession erroneously suggested that his mere ownership of the vehicle could provide a basis for conviction. He asserts that the instruction allowed the jury to find that he possessed the drugs based solely on the fact that they were in his truck.

Reviewing this preserved claim of legal error de novo, we find no such flaw in the court's instructions. As we have described, the court repeatedly charged the jurors that they had to

-27-

find that Ramos acted knowingly and intentionally. The court also correctly informed the jurors that they must follow the instructions in their entirety, and could not "ignore one and favor another." In so stating, the court effectively linked its instructions on intent with its instructions on possession, and the inescapable message conveyed was that the jury needed to find intentional possession, whether actual or constructive. Moreover, in charging on Ramos's alibi defense, the court emphatically stated the government's burden to prove that Ramos was at the scene of the crime and not at the beach: "Unless the Government proves [that the defendant 'was present at that time and place'] beyond a reasonable doubt, then you must find the defendant not guilty." That instruction, too, plainly rejects a finding of guilt based solely on Ramos's relationship to the truck.

In sum, the court expressly announced and reinforced the jury's obligation to find Ramos's knowing and intentional involvement in the crime. We thus reject his contention that the instruction on constructive possession was inadequate as a matter of law.

Ramos is correct, however, that the instruction on joint possession was improper because the record contains no evidence of such a theory, and no party argued it. Most likely, the trial judge unthinkingly read the instruction distinguishing between sole and joint possession simply because it is part of the boilerplate

jury charge on possession with intent to distribute a controlled substance.  See Pattern Instructions, supra.  The court, however, should have been mindful of the facts of the case before it.  See United States v. Wolak, 923 F.2d 1193, 1198 (6th Cir. 1991) (noting that boilerplate instructions "should not be used without careful consideration being given to their applicability to the facts and theories of the specific case being tried").  Nonetheless, no objection was made to the instruction at trial, and our review is thus for plain error.  Accordingly, Ramos must bear the "heavy burden" of showing that the error was clear or obvious, and that it both affected his substantial rights and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Ramos-Mejía, 721 F.3d 12, 14 (1st Cir. 2013) (internal quotation marks omitted).

In asserting prejudice, Ramos claims that the faulty instruction may have influenced the jurors to improperly find him guilty based on a theory of joint possession with Néris.  On the record before us, we are unpersuaded that the jurors would have made such a mistake.  The jury was faced with a clear choice between the government's theory that Ramos was driving the vehicle (and, hence, possessed the cocaine) and Ramos's alibi defense that Néris was the driver (and, hence, the possessor).  No one suggested that Ramos could be found guilty if Néris, not he, had been the one to abandon the cocaine in the truck.  Indeed, as quoted above, the

court told the jurors they must find the defendant not guilty if the government failed to prove his presence at the scene of the pursuit. Although the jurors sought clarification on the meaning of "possession," there is no indication that the notion of joint possession played a role in their deliberations. Rather, their questions focused on state of mind and constructive possession, the central components of the government's theory that, notwithstanding his physical distance from the truck after he fled, Ramos knowingly and intentionally possessed the cocaine he left behind. Cf., e.g., United States v. James, 819 F.2d 674, 675-76 (6th Cir. 1987) (reversing conviction based on improper instruction on constructive possession where jury note indicated high probability of jurors' reliance on constructive-possession theory).

The government's theory is amply supported in the record, and we see little risk that the alibi evidence of an alternative suspect would have led a reasonable jury to find guilt based on joint wrongdoing by the two men. Consequently, regardless of the clarity of the instructional misstep, we cannot find plain error. The joint possession charge neither affected Ramos's substantial rights nor had a serious impact on "the fairness, integrity, or public reputation" of his trial. Ramos-Mejía, 721 F.3d at 14 (internal quotation marks omitted).

## 2. Missing Witness Instruction

Immediately before closing arguments, Ramos's attorney asked the court for a missing witness instruction for Officer Vélez. Counsel noted the First Circuit pattern instruction allowing the jury to draw an adverse inference from a party's failure to call a witness who would be expected to give testimony favorable to that party.[19] The court replied that "no such inference is justified when the witness is available to both sides," and it noted that the defense could have subpoenaed Vélez. Counsel responded, "That's my request," which drew a one-word reply from the court: "Denied."

A district court's refusal to give a missing witness instruction is subject to review for abuse of discretion. See, e.g., United States v. Pagán-Santini, 451 F.3d 258, 267 (1st Cir. 2006). Here, the circumstances squarely support the court's

---

[19] The First Circuit pattern instruction is as follows:

If it is peculiarly within the power of the government to produce a witness who could give material testimony, or if a witness, because of [his/her] relationship to the government, would normally be expected to support the government's version of events, the failure to call that witness may justify an inference that [his/her] testimony would in this instance be unfavorable to the government. You are not required to draw that inference, but you may do so. No such inference is justified if the witness is equally available to both parties, if the witness would normally not be expected to support the government's version of events, or if the testimony would merely repeat other evidence.

Pattern Instructions 2.12.

judgment. First, as described above, the request was undeveloped and halfheartedly pursued. Second, and most importantly, Ramos himself asked that Vélez be excluded as a witness based on the inconsistencies between her testimony in the first trial and the 2007 FBI 302. Having secured the government's acquiescence to that request, Ramos cannot reasonably demand an instruction that, in effect, seeks to penalize the government for making the accommodation. See United States v. Spinosa, 982 F.2d 620, 633 (1st Cir. 1992) (affirming denial of missing witness instruction where the defendant "sought the dual benefit of avoiding [the witness's] potentially harmful testimony at trial, while at the same time obtaining the advantage of a negative inference drawn by the jury about the government's failure to produce" the witness).

Third, neither of the primary justifications for the instruction applied here. We have explained that, as a prerequisite for a missing witness instruction, a criminal defendant must show either that the uncalled witness is "favorably disposed" to testify on behalf of the government -- meaning that the government ordinarily would be expected to produce that witness -- or that the witness is "peculiarly available" to the government. United States v. Perez, 299 F.3d 1, 3 (1st Cir. 2002) (internal quotation marks omitted). Nothing in the record suggests that Ramos lacked access to Vélez or was unable to call her as a witness. Less clear is which side would have benefitted more from

her testimony.  Although Vélez's testimony presumably would have favored the prosecution, she would have faced vigorous cross-examination based on the newly revealed, inconsistent FBI report from 2007.

Given the uncertainties, it is unsurprising that neither side called Vélez as a witness.  For that reason, and the others we have identified, the district court cannot be faulted for refusing to advantage Ramos with a missing-witness instruction.

## III.

Ramos asserts a variety of sentencing errors, most of which he acknowledges were not raised below.  We address each claim in turn, identifying the applicable standard of review as part of our analyses.  Generally, however, any assertion of sentencing error raised for the first time on appeal is afforded only plain error review.  See, e.g., United States v. Ramos, 763 F.3d 45, 56 (1st Cir. 2014).  In evaluating a preserved challenge to the trial court's choice of a particular sentence, we most commonly apply the deferential abuse-of-discretion standard.  See United States v. Suárez-González, 760 F.3d 96, 101-02 (1st Cir. 2014) (applying that standard to the court's balancing of the sentencing factors and the substantive reasonableness of the sentence imposed).

### A.  Timing of the Sentencing Hearing

Ramos contends that the district court erred by giving him only nineteen days to review, and comment on, the updated PSR

that was prepared after his retrial conviction.  He relies on Federal Rule of Criminal Procedure 32, which states, in pertinent part:

> Minimum Required Notice.  The probation officer must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government **at least 35 days before sentencing** unless the defendant waives this minimum period.

Fed. R. Crim. P. 32(e)(2) (emphasis added).  A district court's compliance with Rule 32 is reviewed de novo, and we will remand for resentencing if we find error that was not harmless.  See United States v. González-Vélez, 587 F.3d 494, 508-09 (1st Cir. 2009).

### 1. Background

Ramos's updated PSR was disclosed by the Probation Office on March 20, 2012.  On April 6, along with his response to the PSR, Ramos filed a motion to continue sentencing on the ground that he needed more time to prepare a request for a lower sentence based on his medical condition.  Ramos, then 43 years old, reported that he was awaiting additional medical records so he could submit an expert opinion on "the impact that a long term period of incarceration will have upon [his] cardiac condition."  He therefore sought "the 35-day statutory time period to properly address these issues."

The district court denied the requested continuance at the sentencing hearing, which was held as scheduled on April 9.  The court acknowledged that only nineteen days had elapsed since

-34-

disclosure of the amended PSR, but it deemed that period adequate because it thought an amended PSR was unnecessary and that Ramos could have been sentenced based on the original PSR. The court said it "gave [Ramos] the break" when it ordered an amended PSR so he could pursue his claim that his criminal history was incorrectly calculated.[20] The court thus concluded that Rule 32(e)'s 35-day notice period did not apply.

### 2. Discussion

The government argues that the application of Rule 32 in the particular circumstances of this case is a novel question and that the district court's reading of the rule was reasonable. The government further asserts that any error was harmless because the record demonstrates that a continuance to satisfy Rule 32's 35-day requirement would not have resulted in a different sentence. It points out that the district court emphatically rejected the possibility that further information about Ramos's heart condition -- the reason he said he needed a continuance -- would impact the sentence.

We do not take lightly the requirements of Rule 32, whose time limits "are integral to the fair and orderly process of

---

[20] The Probation Office in fact concluded that a prior conviction had been improperly counted toward Ramos's career offender status, but the PSR substituted another conviction to support the recommendation for career offender status. That substituted conviction is the subject of the claimed error discussed in Section III.B infra.

imposing sentence." United States v. Casas, 425 F.3d 23, 59 (1st Cir. 2005) (internal quotation marks omitted). The procedures it prescribes may not be dismissed as "mere technicalities." United States v. López-López, 295 F.3d 165, 169 (1st Cir. 2002). Hence, we are inclined to conclude that the full array of Rule 32's protections ordinarily should accompany a PSR that is revised and reissued after a new trial and guilty verdict. It is no less important for a new sentencing to be fair and accurate than it was for the original proceedings, and the Rule sets the default time periods for achieving that objective. A defendant's circumstances could have changed in any number of ways during the lapse of time between convictions. He may have a new attorney, new convictions, or new evidence of mitigating factors -- all of which may influence the sentencing process. Indeed, the district court in this case acknowledged that the amended PSR served an important function because its preparation revealed that an ineligible conviction had previously been counted to establish career offender status. The logic in excluding an amended PSR from the scope of Rule 32, when that report is part of a wholly new proceeding, prepared after a retrial and verdict, is not apparent.

Enforcing the Rule's time limits need not compromise a court's interest in avoiding redundancies and moving cases to completion. In many instances of resentencing after re-conviction, the Probation Office will be able to take advantage of its earlier

-36-

work, and, hence, the investigative stage of the process will proceed quickly. In addition, both the defendant and the court have the ability to modify the 35-day minimum period where appropriate. See Fed. R. Crim. P. 32(e)(2) (allowing waiver by the defendant); 32(b)(2) (allowing the court to change the Rule's time limits for good cause). Time for deliberation is intentionally built into the system, however, and the production of an amended PSR following a retrial and new conviction would seem to trigger the Rule's protections as a matter of course.

Nonetheless, even if the district court erroneously denied a continuance in this case, that error would not require a remand for resentencing. We agree with the government that the district court's statements at the sentencing hearing demonstrate beyond debate that the court would not have sentenced Ramos more favorably even if presented with additional evidence on the impact of incarceration on his cardiac condition. Cf. Casas, 425 F.3d at 63 (finding "a reasonable probability that the district court will impose a more favorable sentence on remand"). The court firmly rejected the value of the proposed testimony of Ramos's surgeon, stating that it already had reviewed Ramos's medical records and understood the dire nature of his "very serious cardiac condition." The court noted that Ramos had been seen by "a first class cardiologist" during trial because he felt sick, and the doctor had

found "only the typical complications that any person who has had a heart valve transplant faces."

The court also expressly rejected the applicability of Guidelines Section 5H1.4, which allows a downward sentencing departure for "[a]n extraordinary physical impairment" and gives as an example "the case of a seriously infirm defendant [for whom] home detention may be as efficient as, and less costly than, imprisonment."  See U.S.S.G. § 5H1.4.  The court viewed Ramos's condition as serious, but unpredictable: "He could live until he's 70.  But he has a cardiac condition, and he could also die tomorrow."  The court thus demonstrated unwillingness to further consider sentencing leniency based on Ramos's medical condition.  As the pursuit of further medical information was the only justification offered for Ramos's requested continuance, we conclude that the refusal to grant the extra time, if error, was harmless.

## B. Career Criminal Classification

In challenging the district court's decision to sentence him as a career offender, Ramos claims that the district court improperly counted his 1987 conviction for violating Article 256 of the Puerto Rico Penal Code -- which makes unlawful the use of violence or intimidation against public officials -- as a predicate crime of violence.  See supra Section I.B & n.3.  As described above, one paragraph of Ramos's PSR lists convictions for a

-38-

controlled substance offense and violating Article 256, both occurring on the same day in March 1987 and substantiated by unspecified "judicial documents."[21] At Ramos's sentencing hearing, the probation officer provided the court with a stack of commonwealth court records referencing the two convictions, which were based on guilty pleas, and the documents were subsequently translated into English and entered on the docket. See Dkt. 237.

In his sentencing memorandum, Ramos had objected to counting the Article 256 conviction for career offender purposes on the ground that it occurred outside the limitation period in the Sentencing Guidelines. See U.S.S.G. §§ 4B1.1(a), 4B1.2(c), 4A1.1(a), 4A1.2(e).[22] At his sentencing hearing, he complained that

---

[21] The court did not rely on the 1987 controlled substance offense and, as explained infra, it is not a qualifying predicate crime.

[22] Section 4B1.1 states the requirements for career-offender status, see supra n.2, and § 4B1.2 explains that the requirement of "two prior felony convictions" means, inter alia, that the sentences for those crimes are counted separately under § 4A1.1, which lists the criminal history points assigned to various terms of imprisonment. Section 4A1.2, which is labeled "Definitions and Instructions for Computing Criminal History," states in pertinent part as follows:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

U.S.S.G. § 4A1.2(e)(1). Hence, Ramos's Article 256 conviction would count as a prior felony conviction if he received a sentence

-39-

the supporting judicial documents produced by the probation officer were not an "approved" source of information about that crime. See, e.g., United States v. Carter, 752 F.3d 8, 19 (1st Cir. 2014) (internal quotation marks omitted).  On appeal, Ramos reiterates those objections and argues in addition that, regardless of timing, the Article 256 conviction does not qualify as a predicate crime of violence.

As a starting point, we reject Ramos's contention that the Article 256 crime was too remote to count as a predicate offense for career offender purposes.  Indeed, Ramos raises that claim to this court only in his reply brief, and we therefore need not address it at all.  See, e.g., United States v. Diaz-Castro, 752 F.3d 101, 106 n.3 (1st Cir. 2014) (noting that an argument not presented in appellant's opening brief on appeal is waived).  The claim also fails, however, on the merits.  The commonwealth court records show that Ramos, then nineteen years old, was given suspended sentences on the Article 256 and controlled substance convictions in December 1987, contingent on his completing an inpatient treatment program (the "Puerto Rico Teen Challenge Program") and fulfilling other conditions.  See Dkt. 237 at 7, 90.[23]

---

exceeding one year and one month that resulted in his imprisonment at any time in the fifteen years preceding July 4, 2002.

[23] Ramos cites no case limiting our consideration of reliable commonwealth court records to determine the timing of his conviction or incarceration.  The cases on which he relies discuss documents that may be reviewed to determine the elements of the

In May 1988, Ramos was ordered arrested and held without bail, and his suspended sentence was formally revoked later that year.  Id. at 83, 110-111.  He was thus incarcerated within fifteen years of the July 4, 2002 drug trafficking crime underlying this appeal, placing the sentence within the period prescribed by Guidelines § 4A1.2(e).

Ramos's remaining challenge to his designation as a career offender is that his Article 256 conviction is categorically ineligible to qualify as a predicate crime of violence.  Because this argument is raised for the first time on appeal, our review is for plain error.

### 1. Identifying a Predicate Crime of Violence

Under the Guidelines, an offense qualifies as a crime of violence if it is punishable by more than one year of imprisonment and either "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another," or (2) is one of several enumerated crimes not pertinent here, "or otherwise involves conduct that presents a serious potential risk of physical injury to another."  U.S.S.G. § 4B1.2(a).  To determine whether a defendant's past conviction falls within the scope of § 4B1.2(a), courts use either a "categorical approach" or a

---

crime of conviction.  See, e.g., Shepard v. United States, 544 U.S. 13, 26 (2005) (plurality opinion); Carter, 752 F.3d at 19.

"modified categorical approach." See, e.g., Descamps v. United States, 133 S. Ct. 2276, 2281 (2013); Carter, 752 F.3d at 16-17.[24]

Under the categorical approach, an offense constitutes a crime of violence "only if its elements are such that we can conclude that a person convicted of the offense has 'necessarily' been found guilty of conduct that meets the [§ 4B1.2(a)] definition." United States v. Martínez, 762 F.3d 127, 133 (1st Cir. 2014). The categorical approach limits the court's inquiry to "'the elements of the statute of conviction, not . . . the facts of each defendant's conduct.'" United States v. Fish, 758 F.3d 1, 5 (1st Cir. 2014) (quoting Taylor v. United States, 495 U.S. 575, 601 (1990)). Hence, under the categorical approach, we would ask whether Ramos's conviction for violating Article 256 necessarily means -- without considering his actual conduct -- that he used, attempted to use, or threatened to use force against another person, or engaged in conduct presenting "a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a).

However, when a defendant's prior conviction is for violating a "divisible statute" -- i.e., a statute that "sets forth

---

[24] Much of the case law developing the two approaches has arisen in the context of the Armed Career Criminal Act, which imposes sentencing enhancements on defendants who have three prior convictions for "serious drug offenses or violent felonies." Shepard, 544 U.S. at 15; see also, e.g., Descamps, 133 S. Ct. at 2281; Taylor v. United States, 495 U.S. 575, 577-78 (1990). We have long recognized the applicability of this precedent to the career offender inquiry. See United States v. Dávila-Félix, 667 F.3d 47, 55-56 & n.9 (1st Cir. 2011).

-42-

one or more elements of a particular offense in the alternative," Fish, 758 F.3d at 6 (citing Descamps, 133 S. Ct. at 2281) -- the modified categorical approach may be the appropriate method for resolving the crime-of-violence question. If such a provision alternatively criminalizes qualifying violent conduct and non-qualifying conduct, making it impossible to determine from the face of the statute whether the defendant's conviction was for a crime of violence, the sentencing court is permitted to consult a limited set of "approved records" to determine which alternative provided the basis for the conviction. Carter, 752 F.3d at 19 (internal quotation marks omitted); see also Descamps, 133 S. Ct. at 2284-85. These records include charging documents, plea agreements, transcripts of plea colloquies, jury instructions, and verdict forms. Johnson v. United States, 559 U.S. 133, 144 (2010); see also Taylor, 495 U.S. at 602 (acknowledging the need for courts to look to the charging papers and jury instructions in a "narrow range of cases" involving crimes with alternative elements); United States v. Dávila-Félix, 763 F.3d 105, 110 n.5 (1st Cir. 2014) (noting the need to consult "certain documents of record" for divisible statutes (citing Taylor and Descamps)). The question then becomes whether the variant of the crime revealed by those documents satisfies the crime of violence definition.

**2. Does Ramos's Article 256 conviction qualify as a predicate crime of violence?**

As described above, Article 256 criminalizes the use of violence <u>or</u> intimidation against a public official or employee. The government maintains that both alternatives constitute crimes of violence, making it unnecessary to perform the modified categorical inquiry, while Ramos asserts that a violation based on "intimidation" does not necessarily qualify as such an offense because a threat to damage property suffices to satisfy that prong. Neither party offers useful support for its argument. The government cites only a single, inapposite case,[25] and Ramos relies on what is apparently his own translation of a sentence from a Spanish-language treatise on Puerto Rico's penal code.[26]

---

[25] The government relies on <u>United States</u> v. <u>Santos</u>, 131 F.3d 16 (1st Cir. 1997), where the defendant was charged with "threatening the life of and bodily harm to the President," in violation of 18 U.S.C. § 871. <u>Id.</u> at 21. We concluded that the district court properly classified the offense as a crime of violence because it "had as an element the threatened use of physical force against another person," one of the triggering attributes of a crime of violence under Guidelines § 4B1.2. <u>Id.</u> <u>Santos</u> sheds no light on whether a conviction for use of intimidation under Article 256 would necessarily include any of the requisite elements of a crime of violence.

[26] Ramos quotes a text titled "Penal Code of Puerto Rico" by Dora Nevares-Muñiz for the proposition that "intimidation refers to the use of coercion or psychological pressure on the person, characterized by the threat that he will suffer imminent and unjustified damage to his or her person or property." It does not appear that the volume ("Código Penal de Puerto Rico") is available in English.

-44-

The government has offered no basis on which we could conclude that both the "violence" and "intimidation" prongs of Article 256 necessarily include an element related to either physical force against an individual or a "serious potential risk of physical injury" to a person, which would allow us to classify the statute as a crime of violence under the categorical approach. Although the government states in its brief that "judicial records" report that Ramos's Article 256 crime involved physical action against a police officer, it does not argue that the conviction qualifies under the modified categorical approach. Hence, the government has waived that backup position. Nonetheless, given the significance of the issue here and the likelihood that similar circumstances will arise in other cases, we think it important to explain why the argument would in any event fail.

Although most of the Superior Court documents submitted by the probation officer do not fall into any of the usual categories of permissible records, we have observed that, "[i]n addition to these 'approved' records, a federal court may also consider some comparable judicial record." Carter, 752 F.3d at 19 (footnote omitted) (internal quotation marks omitted). Our review, however, "'must be "confined to [the] records of the convicting court,"'" id. (quoting United States v. Turbides-Leonardo, 468 F.3d 34, 39 (1st Cir. 2006) (quoting Shepard, 544 U.S. at 23) (alteration in original)), and we thus "may not rely on the police

-45-

reports related to the earlier conviction," id. at 20 (citing Shepard, 544 U.S. at 16).

The only commonwealth document among the submitted records that describes the episode leading to Ramos's Article 256 charge is a Complaint filed by a Caguas police officer, stating as follows:

> Above-referenced defendant, Cruz Roberto Ramos-Gonzalez, on or about November 15, 1986 at 7:00 p.m. at the Boneville Height hous. proj. in Caguas, P.R., used violence and intimidation against OFF. Orlando Rosa-Santana #8812 who was a PUBLIC OFFICIAL at the time, member of the P.R. Police, offering resistance during an act in compliance of his duty and functions:
>
> The act consisted of jumping on the office[r,] causing him to fall to the ground, and grabbing him once he got back up.

Dkt. 237, at 18. The PSR in this case depicts a similar encounter, stating that Ramos resisted arrest on the drug charge "by pushing and grabbing one PRPD officer." Neither of these documents, however, is an approved source for determining whether Ramos's conviction was based on the use of violence or intimidation. See Carter, 752 F.3d at 20 ("[T]he police incident report . . . might include sufficient details to make such a determination, but we are precluded from using it for that purpose."); see also id. ("[A] presentence report in a subsequent case ordinarily may not be used to prove the details of the offense conduct that underlies a prior conviction." (internal quotation marks omitted)).

-46-

The charging document for the Article 256 violation, an "approved" record under Shepard and related precedent, is less specific. It states, in pertinent part, that Ramos "unlawfully, voluntarily, knowingly and criminally, making use of violence or intimidation, resisted a public official and/or government employee in the performance of his duties." See Dkt. 237, at 5. In addition, the Minutes of a proceeding held on March 12, 1987 in Puerto Rico Superior Court report that Ramos waived jury trial on the related drug and Article 256 charges and that he,

> in accordance with a plea agreement with the Prosecutor, pleads guilty to the crime of violation of the Controlled Substances Act, possession, Art. 404 on case G87-222 and violation of Art. 256 of the Penal Code in case G87-221.

Dkt. 237, at 37. Neither the plea agreement nor the plea colloquy are among the submitted records, and no other document sheds light on Ramos's admissions in connection with his guilty plea.

Relying on the documents in the record that we are permitted to consult, we cannot conclude that Ramos's 1987 conviction was for a crime of violence within the meaning of the career offender provision of the Guidelines. We have been cited no authority for categorically classifying an act of "intimidation" in violation of Article 256 as a crime of violence, and the record does not permit us to know the type of conduct admitted by Ramos. The charging document asserted that Ramos made use of violence or intimidation. Although the police complaint described a physically

-47-

violent interaction, Ramos's admission of guilt may not have incorporated those details.  Cf. Descamps, 133 S. Ct. at 2289 (noting the unfairness of imposing a sentence enhancement based on facts in the record when the defendant may have bargained for a guilty plea to a lesser crime).  In that regard, the circumstances of the drug conviction are telling.  The police complaint alleged that Ramos had possessed cocaine with the intent to distribute it, a violation of Article 401 of the Puerto Rico Controlled Substances Act, P.R. Laws Ann. tit. 24, § 2401, see Dkt. 237, at 16, 21, but, as noted above, he pleaded guilty to a possession crime in violation of Article 404, P.R. Laws Ann. tit. 24, § 2404.  It appears that the severity of the drug crime was reduced in the course of plea negotiations.[27]

In short, on this record, Ramos's Article 256 conviction does not qualify as a crime of violence either categorically or, under the modified categorical approach, based on the elements that Ramos admitted.  The absence of any support for classifying that conviction as a crime of violence makes the court's error in relying on it plain.[28]  The remaining components of the plain error

_____

[27] The Article 404 drug possession conviction is not a controlled substance offense for career offender purposes.  See U.S.S.G. § 4B1.2(b) (defining "controlled substance offense" in that context to include possession accompanied by "intent to manufacture, import, export, distribute, or dispense" the drug); see also Dávila-Félix, 763 F.3d at 107-08 & n.3.

[28] Ramos notes that the district court did not expressly identify the Article 256 violation as one of the two triggering

-48-

test -- prejudice to the defendant and the threat of a miscarriage of justice -- also are satisfied here. See United States v. Jones, 748 F.3d 64, 69 (1st Cir. 2014). The government does not dispute Ramos's assertion that, without career offender status, his applicable Guidelines range would be substantially lower.[29] We previously have observed that, "as to the threat of miscarriage of justice if we declined to remand, the difference in potential jail time would be a concern in any balance." United States v. Torres-Rosario, 658 F.3d 110, 117 (1st Cir. 2011).[30] To the extent relevant to the plain error inquiry, the government asserts no offsetting circumstances. See id. (noting the ease of addressing

---

convictions, but its colloquy at the sentencing hearing rejecting Ramos's objections to the commonwealth records inescapably shows that it did.

[29] Ramos asserts that, without career offender status, his total offense level would be 30, which would carry a Guidelines sentencing range of 151-188 months under CHC V (which he claims is applicable) and 168-210 months under CHC VI (which the government claims is applicable). In fact, as described infra, the district court began with a lower BOL than Ramos suggests, which would have produced a sentencing range of 130-162 months under CHC V without career offender status (and 140-175 months under CHC VI) if all other factors remained the same.

[30] Although it might seem that the career offender error is harmless because Ramos was sentenced to multiple life terms for his convictions in the conspiracy case, Ramos's pending appeal in that case challenges both his convictions and sentences. We decline to rely on a non-final term of imprisonment in a separate case to justify leaving intact the erroneous term of imprisonment here. Cf. United States v. Almonte-Nuñez, 771 F.3d 84, 92 (1st Cir. 2014) (noting a preference for "trimming back an excessive sentence" on plain error review, even when a defendant's "overall period of immurement will not be affected," where defendant was improperly sentenced in excess of a statutory maximum).

the Shepard issue on remand without need for a new trial); Dávila-Félix, 667 F.3d at 57 (holding that "[t]he standards of plain error review clearly are met," without analyzing the third and fourth prongs, where the record did not show qualifying predicate crimes).

### 3. The Scope of Resentencing

In other cases, we have explicitly allowed the parties to further develop the record on the question of career offender status. See, e.g., Carter, 752 F.3d at 21; Torres-Rosario, 658 F.3d at 117; cf. Dávila-Félix, 763 F.3d at 113-114 (upholding career offender enhancement where district court accepted new evidence of predicate crimes on remand). In this case, however, the government already has had two opportunities to offer evidence in support of the career offender enhancement. As noted earlier, the Probation Office acknowledged relying on an ineligible conviction in Ramos's first PSR, and it substituted the March 1987 conviction to establish career offender status. See supra note 20. We recently observed that "no party -- including the government -- is entitled to an unlimited number of opportunities to seek the sentence it desires." Dávila-Félix, 763 F.3d at 113. Moreover, "in a case where the government asked for [an] enhancement but failed to adduce sufficient proof for its imposition . . . there would not likely be reason to permit a second bite at the apple." Id. (alteration and omission in original) (internal quotation

marks omitted). A fortiori, the government here may not reopen the record to take a third bite at the career offender apple.[31]

Accordingly, we must vacate Ramos's sentence and remand for resentencing without the career offender enhancement.

## C. **Apprendi/Alleyne Error**

Invoking Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 133 S. Ct. 2151 (2013), Ramos argues that his Fifth and Sixth Amendment rights were violated when the district court sentenced him based on a drug quantity that was not found by a jury beyond a reasonable doubt. This claim was not raised below and is therefore reviewed only for plain error. In this instance, however, the standard is irrelevant because no drug-quantity error occurred in his sentencing.

The Supreme Court's decisions in Apprendi and Alleyne establish that a jury must find beyond a reasonable doubt any drug quantity that triggers a mandatory-minimum and a statutory-maximum sentence under 21 U.S.C. § 841, whose multiple subsections set out different crimes. See, e.g., United States v. Pizarro, 772 F.3d 284, 292 (1st Cir. 2014). In this case, Ramos acknowledges that the indictment charged, and the jury found, that he possessed at least 500 grams of cocaine. Under § 841(b)(1)(B), a defendant

---

[31] The government has not suggested that evidence already in the record would permit sentencing Ramos as a career offender if the Article 256 conviction may not be counted as a predicate crime of violence. We therefore do not address that circumstance.

found guilty of possessing for distribution at least 500 grams but less than five kilograms of cocaine is subject to a mandatory minimum term of five years and a maximum of forty years imprisonment. Both the PSR and the district court's comments at sentencing placed the amount of cocaine seized from the truck at roughly two kilograms -- an amount within the same statutory range as the 500 grams found by the jury. In other words, the record shows unequivocally that Ramos's sentence was based on the statutory range consistent with the jury's finding. Hence, no Apprendi or Alleyne error occurred.

It is possible that Ramos's actual complaint is that the district court used the wrong Guidelines sentencing range.[32] He asserts that his BOL "was calculated as if he had been convicted of possessing at least two kilograms" of cocaine. This assertion is incorrect. Although the PSR concluded that Ramos was responsible for just over two kilograms, the district court at sentencing expressly used the BOL for an offense involving at least 500 grams but less than two kilograms of cocaine. See U.S.S.G. § 2D1.1(7) (Level 26).

---

[32] As we have recently explained, if the jury makes the required threshold finding to trigger a mandatory minimum (in this instance, "500 grams or more" of cocaine), but does not indicate a specific quantity, the district court may make a drug quantity finding by a preponderance of the evidence to determine the recommended sentence under the Guidelines. The sentence imposed must be within the statutory range. See Pizarro, 772 F.3d at 294 n.14.

In sum, the drug quantity on which the district court based Ramos's sentence was proper under both the Guidelines and § 841(b)(1)(B).

## D.  Reasonableness of the Sentence

Ramos claims that the district court abused its discretion by sentencing him to a substantial prison term without adequately taking into account the severity of his heart condition. He argues that the court failed to follow the statutorily prescribed "parsimony principle" -- i.e., that "a sentence [be] sufficient, but not greater than necessary," to achieve the legitimate objectives of sentencing.  18 U.S.C. § 3553(a).  In particular, Ramos complains that, given his age and physical condition, as well as his then-anticipated (and now imposed) life sentence in the conspiracy case, his 327-month sentence in this case was unnecessary to accomplish the objectives of deterrence and protecting the public from further crimes by him.  See id. § 3553(a)(2)(B), (C).  Ramos also complains that the court disregarded "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care."  Id. § 3553(a)(2)(D).

Given that Ramos will be resentenced without the career offender enhancement, inevitably reducing his term of imprisonment in this case, we need not address this challenge to the length of his sentence.  We note, however, that the district court has broad discretion to balance the pertinent sentencing factors, and "its

-53-

choice of emphasis . . . is not a basis for a founded claim of sentencing error."  United States v. Colón Ledée, 772 F.3d 21, 41 (1st Cir. 2014) (omission in original) (internal quotation marks omitted).  Nonetheless, on remand, the district court will have available more recent information about Ramos's health that it may consider in selecting an appropriate sentence under the applicable Guidelines range.

**IV.**

To recap our holdings on Ramos's claims:

(1) The government's nearly five-year delay in bringing the indictment did not violate Ramos's due process rights;

(2)  The district court did not abuse its discretion in denying Ramos's motion to dismiss the indictment for prosecutorial misconduct.  We urge the United States Attorney's Office in Puerto Rico, however, to implement procedures that will enable it to fulfill its obligation in every case to become aware in a timely fashion of material evidence "known to the others acting on the government's behalf in the case, including the police," Kyles, 514 U.S. at 437, and disclose such evidence to the defense;

(3) The district court did not err in excluding an alibi witness and refusing a missing witness instruction, and the erroneous portion of its instructions on possession did not rise to the level of plain error;

-54-

(4) The court's refusal to continue Ramos's sentencing hearing, if error, was harmless;

(5) The district court incorrectly relied on Ramos's Article 256 conviction to designate him as a career offender and, hence, he must be resentenced.  On remand, the government may not seek to justify the career offender enhancement with new predicate crimes.  The court, however, may consider anew both parties' previously raised arguments concerning the appropriate sentence.

So ordered.