# United States Court of Appeals
## For the First Circuit

No. 19-1842

UNITED STATES OF AMERICA,

Appellee,

v.

DOUGLAS NORRIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Ines McGillion, with whom Ines McGillion Law Offices, PLLC was on brief, for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

December 28, 2021

**KAYATTA**, <u>Circuit Judge</u>. During the search of a Brockton, Massachusetts apartment pursuant to a warrant, police found a gun, ammunition, cocaine, and various drug paraphernalia. Douglas Norris, identified as one of the apartment's residents, was convicted by a jury of several contraband-possession offenses, including being a felon in possession of a firearm. On appeal, Norris raises four groups of errors. He claims that: (1) the district court improperly instructed the jury on joint possession; (2) the government presented insufficient evidence on the element of possession for all counts; (3) lay opinion testimony from law enforcement witnesses was improperly admitted at trial; and (4) the government did not allege or prove, and the jury was not required to find, that Norris knew of his status as a felon that prohibited him from possessing a firearm, contrary to the Supreme Court's decision in <u>Rehaif</u> v. <u>United States</u>, 139 S. Ct. 2191 (2019). For the reasons that follow, we find no reversible error and affirm Norris's convictions.

## I.

### A.

We begin, as did Norris's trial, with the apartment search at the heart of this case. Because Norris has challenged the sufficiency of the evidence against him, we recount the facts in the light most favorable to the verdict. <u>United States</u> v. <u>McBride</u>, 962 F.3d 25, 28 (1st Cir. 2020).

- 2 -

In the early morning of June 20, 2017, the Brockton Police Department's (BPD) Special Reaction Team (SRT) executed a search warrant at Apartment 2A of a building on North Warren Avenue. Upon entering the unit, the SRT encountered several occupants, though not Norris. In the first bedroom, referred to in the trial as "Bedroom 1," officers saw a woman identified as Nakaita Brown and a baby. Elsewhere in the apartment, they found a man named Jose Lora and his fiancée Adris Pimentel. All of the occupants were escorted to the kitchen while the search proceeded.

In Bedroom 1, officers observed clothing they identified as "adult male attire," including pants, shirts, and sneakers, as well as boxes for sneakers in men's sizes 10.5 and 11. Many of these articles were found and photographed within the bedroom's closet. Additionally, hanging in the closet was a black backpack that contained a loaded firearm, a plastic bag containing twenty loose rounds of .9 millimeter ammunition, and two digital scales. The backpack's front pocket contained a single .45 caliber round of ammunition and three plastic bags containing substances later determined to be cocaine hydrochloride and cocaine base. The gun, ammunition, and magazine were swabbed for DNA, and the parties stipulated that the lab identified a partial DNA profile "consistent with a mixture of DNA from at least three individuals," at least one of whom was male and at least one of whom may have been female.

Officers also found within the closet another digital scale with powder residue on it, a razor blade, some "cut baggies," a box of plastic sandwich bags, a metal object stamped with the words "The Brick Press" -- which was identified as a piece of a hydraulic press system (also called a "kilo press") used to pack powdered drugs into a brick form -- and loose pieces of mail in envelopes addressed to Norris.

Finally, one photograph of the closet depicts a hanging black studded jacket, which was the subject of questions from defense counsel at trial. The officers did not take the jacket into evidence because they thought it had "no value," and, when asked, the officers could not shed any light on whether the jacket belonged to a man or woman.

From other rooms in the apartment, officers recovered two additional plastic bags containing what was later identified as cocaine and cocaine base respectively, a money counter, additional scales, a rifle scope, a pistol magazine, and additional components of the Brick Press.

After concluding the search, the officers left the apartment around 6:30 or 7:00 A.M. and returned to the station. Around 7:50 A.M., BPD Detective Brian Donahue revisited the North Warren Avenue building to locate Norris, who had not been present for the search. Detective Donahue saw Norris leave the property, enter a gray Infiniti parked nearby, and drive away. Following in

an unmarked car, Donahue called for a marked cruiser to stop Norris. Once the Infiniti was stopped, Donahue approached the vehicle and asked Norris for his name. Norris responded, "I'm the one you're looking for."

Norris was charged in the operative superseding indictment with four counts: being a felon in possession of a firearm and ammunition (18 U.S.C. § 922(g)(1)); possessing a substance containing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)); possessing cocaine with intent to distribute (18 U.S.C. § 841(a)(1)); and possessing a firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)).

**B.**

Beyond the evidence described above, the government offered at Norris's trial additional evidence concerning Norris's connection with Apartment 2A. First, about six months earlier, BPD officers had responded to a 911 call at Apartment 2A and encountered Norris, Brown, and a baby. Norris then told the officers that he and Brown had had a disagreement, that he had disconnected the cellphone service maintained in his name, and that Brown wanted to leave. Officers stayed while Brown packed some things and left the apartment.

Then, on June 14, 2017 -- six days before the search -- Norris attended a housing court trial where he successfully

defended against an eviction action for the second-floor apartment at the North Warren Avenue address.

The next day, June 15, BPD Detective Gary Mercurio conducted surveillance of the North Warren Avenue property and observed Norris leave the building, get into and out of a gray Infiniti parked around the corner, then walk back to the building.

Finally, on June 17, Lora and his fiancée Pimentel moved into a bedroom -- designated throughout the trial as "Bedroom 3" -- in Apartment 2A, after arranging with Brown to pay a portion of the rent. Lora testified that Norris, Brown (who he knew as "Coco"), and the baby were living in the apartment, in Bedroom 1, when Lora and Pimentel moved in. In the three days that Lora lived in Apartment 2A before the search on June 20, he saw Norris use Bedroom 1 to change clothes. Norris frequently left the apartment, but Lora did see Norris at the apartment daily before the search, including to share a Father's Day dinner prepared by Brown and Pimentel. By contrast, Lora saw Brown "at the apartment almost all the time." Pimentel testified that she saw Norris go into Bedroom 1, "usually just [to] go to sleep," and Norris had told her that the landlady was trying to evict him and Brown.

Lora also testified that at some point during his time living at Apartment 2A, Brown had told him that she owned a gun and had a license to carry. It is undisputed that Brown did not

- 6 -

in fact have a license to carry a firearm or own any lawfully-registered firearms.[1]

As part of the government's case-in-chief, the prosecution entered a stipulation that Norris had previously been "convicted in a court of a crime punishable by imprisonment for a term exceeding one year within the meaning of 18 U.S.C. § 922(g)(1)." This was the only evidence offered to prove Norris's status as a felon.[2]

After a four-day trial, the jury found Norris guilty on all four counts. The district court denied Norris's post-trial motions for judgment of acquittal and a new trial, and he timely appealed the convictions and those denials.

## II.

Norris raises on appeal four categories of error, which we address in turn. Because our understanding of the jury instruction on joint possession informs the analysis of the

---

[1] Brown did not testify at Norris's trial. This hearsay statement was admitted as a statement against Brown's penal interest under Federal Rule of Evidence 804(b)(3), after the district court found that Brown was unavailable because she indicated that she would invoke her Fifth Amendment privilege against self-incrimination if called to testify.

[2] Norris's presentence investigation report (PSR) indicates that he had previously been convicted of, inter alia, two crimes that resulted in sentences of seven-to-nine years and four-to-five years of imprisonment, respectively.

sufficiency of the evidence of possession, we first assess the propriety of that instruction.

**A.**

In its proposed jury instructions, the government submitted an instruction for "possession" that included a more-or-less standard form of a so-called joint-possession instruction, telling the jury that they could convict even if Norris possessed the contraband jointly with someone else. Norris objected to the inclusion of this instruction, arguing, as he does now, that joint possession was not "the government's case" because the government had argued that Norris alone possessed the gun and drugs.[3] The district court rejected Norris's argument and found the instruction appropriate: "I think that is the case actually. I mean, [the evidence has] presented an excellent picture, actually, that [Brown] was in that bedroom, and she was in there most of the time." The court ultimately included the following in its instruction defining "possession" for the jury:

> Possession also includes both sole possession and joint possession. If one person alone has actual or constructive possession, the possession is sole. If two or more persons share actual or constructive possession, possession is joint. So whenever I use the term "possession" in these instructions, and

---

[3] Norris made no argument that finding possession to be proved by joint ownership constituted an improper amendment of the indictment, which simply alleged that he "knowingly possessed a firearm" and "knowingly and intentionally possessed with intent to distribute cocaine."

I'll be using it again, the term includes actual and constructive possession, as well as joint and sole possession.

Norris renewed his objection to this instruction after it was given. We review his preserved objection de novo. United States v. Howard, 687 F.3d 13, 18 (1st Cir. 2012).

"When crafting jury instructions a judge must consider all of the evidence introduced at trial, in other words, the government's as well as the defense's." Id. at 19. In Howard, we held that a defendant may open the door to a joint-possession instruction through his own evidence and arguments. Id. ("The evidence extant and Howard's own theory of the case made the joint possession and aiding and abetting instructions appropriate.").

Howard had raised a nearly identical challenge to the one Norris now presses, arguing that a joint-possession instruction was inappropriate where, according to the defendant, "the government did not present any evidence that the drugs belonged to anyone else." Id. at 18. There, police had found drugs and a gun during the search of a house where two other people resided. Id. at 15, 19. Howard introduced a stipulation that one of the residents had multiple convictions for gun and drug possession, and he repeatedly argued in closing that the contraband belonged to them, rather than to him. Id. at 18-19 & n.4.

Howard thus argued "that to the extent the inference had been raised that the drugs belonged to [the house's residents],

- 9 -

there was no evidence that Howard was working in concert with them."  Id. at 18.  We found this argument unavailing because Howard's own evidence had been used "to cast suspicion on [the house's residents] and in doing so, raised an inference that he possessed the drugs jointly with [them]."  Id. at 19.

So, too, here.  Norris also attempted to pin the gun and drugs on another occupant of the residence searched.  He successfully sought introduction of Brown's statement to Lora that she owned a gun and had a license to carry, defeating the government's attempt to bar such evidence.  His counsel pressed the testifying officers about a jacket photographed in Bedroom 1's closet -- an arm's length from where the backpack was found -- suggesting the jacket was Brown's.  In closing, his counsel both reiterated this theory about the jacket and pointed to Brown's statement about the gun in arguing that Brown, rather than Norris, was the primary occupant of Bedroom 1 and thus actually possessed the contraband.[4]  Moreover, that the DNA of at least one male and perhaps one female was found on the gun and ammunition does provide

_____

[4]  Specifically, as to the gun, Norris's counsel argued:

"But, importantly, Coco also says she has a gun, okay?  Not a small detail in a case involving a gun, right?  She tells [Lora], 'I have a gun.'  She lies about having a license, right?  But she tells Mr. Lora, 'I have a gun' . . . .  And Coco is the woman in the room with two open scales and an open safe, now has a gun, okay?"

- 10 -

some support for the theory that Brown and Norris jointly possessed these items. In short, "[t]he evidence extant and [Norris's] own theory of the case made the joint possession . . . instruction[] appropriate." Id. It matters not that the government and Norris each argued for a different sole-possessor theory, because these arguments permitted the jury to infer that both purported possessors shared the contraband.[5]

Norris directs us to United States v. Ramos-González, 775 F.3d 483 (1st Cir. 2015), in which we found that a boilerplate joint-possession instruction was improperly given where "the record contain[ed] no evidence of such a theory, and no party argued it." Id. at 499. There, the defendant had presented an alibi defense contending that the truck containing the contraband

---

5 To distinguish Howard, our concurring colleague has retrieved and mined the trial record from Howard to show that the government in that case argued at trial for an alternative joint-possession theory. But our opinion in Howard did not mention, much less rely on, that fact at all. Rather, Howard relied solely on the fact that the defendant's evidence and argument made the joint-possession theory apt, just as here. See 687 F.3d at 18- 19. Adding belt to suspenders, with reference to both the drugs and the gun, the government here plainly argued to the jury, in the alternative, for joint possession: "[P]ossession can be sole or joint. In other words, more than one person can be in actual or constructive possession of an item." Our colleague reads the government as essentially abandoning that theory when it discussed the conduct of drug distribution. But even if the government advanced Norris as the sole drug dealer, that is not necessarily inconsistent with its position that Norris's possession of the contraband could be sole or joint. Moreover, we reject the notion that by advocating for its primary theory the government implicitly abandoned its fallback position that Norris was still guilty even if his possession was joint.

was driven by another person, thus presenting the jury with an either-or proposition that left no room for a joint-possession theory. See id. We reiterated the sound principle that, in charging a jury, a district court must be "mindful of the facts of the case before it." Id. That is precisely what the district court here demonstrated when it remarked, in overruling Norris's objection to the instruction, "I think that is the case actually. I mean, [the evidence has] presented an excellent picture, actually, that [Brown] was in that bedroom, and she was in there most of the time."

**B.**

We turn next to Norris's argument that the government failed to introduce sufficient evidence that he knowingly possessed any of the drugs, gun, or ammunition, either directly or constructively. Norris preserved this argument by timely raising it in his post-trial motion for a judgment of acquittal under Rule 29, see United States v. Castro-Lara, 970 F.2d 976, 980 (1st Cir. 1992), so we review the claim de novo, United States v. Mendoza-Maisonet, 962 F.3d 1, 11 (1st Cir. 2020). We therefore assess the evidence and "all plausible inferences drawn therefrom" in the light most favorable to the prosecution and determine whether "a rational factfinder" could have found the elements proved beyond a reasonable doubt. United States v. Torres Monje, 989 F.3d 25, 27 (1st Cir. 2021) (quoting United States v. Santos-

Rivera, 726 F.3d 17, 23 (1st Cir. 2013)). For this task, "we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018). "Nor do we have to be convinced 'that the government succeeded in eliminating every possible theory consistent with the defendant's innocence.'" Mendoza-Maisonet, 962 F.3d at 12 (quoting Acevedo-Hernández, 898 F.3d at 161).

Possession can be actual -- meaning "hands-on physical possession" -- or constructive. United States v. Padilla-Galarza, 886 F.3d 1, 5 (1st Cir. 2018). "[C]onstructive possession is shown by proving that the defendant had 'dominion and control over the area where the contraband was found,'" and it may be established by circumstantial evidence. Mendoza-Maisonet, 926 F.3d at 12 (quoting Padilla-Galarza, 886 F.3d at 5). And, as explained, constructive possession can be joint. United States v. Hicks, 575 F.3d 130, 139 (1st Cir. 2009).

Here, the government introduced substantial evidence that Apartment 2A and Bedroom 1 -- including its closet -- were under Norris's "dominion and control." Six days before the search, Norris appeared in court to defend successfully against eviction from Apartment 2A, the same apartment where law enforcement had encountered Norris and Brown six months earlier and where Norris had stayed after the officers assisted Brown's departure. Though

Lora and Pimentel resided at Apartment 2A only briefly, they testified to witnessing Norris go into Bedroom 1 to sleep and change clothes in the days leading up to the search. This evidence is consistent with the officers' testimony that they found men's-sized sneakers and what appeared to be men's pants and shirts in Bedroom 1 and in the closet that contained the backpack housing the gun. That closet also contained multiple pieces of mail addressed to Norris.

True, Brown and the baby were also seen using Bedroom 1, and Norris's counsel argued that Brown was its primary occupant. However, there was no evidence introduced that any of Brown's belongings or clothes were seen in the room, and while Norris argues about the jacket hanging near the backpack, nothing at trial beyond counsel's questions suggested that it was Brown's jacket. Lora also testified that he saw Norris come and go frequently, while Brown tended to stay in the apartment with the baby "almost all the time." If one of two people is definitively distributing drugs, the jury could reasonably infer from this contrasting behavior that, as between the person who goes in and out and the person who stays put to care for a baby, the former is more likely the dealer.

Additionally, when Norris was pulled over shortly after returning to North Warren Avenue and within a couple hours of the search, he told Detective Donahue, "I'm the one you're looking

for." While Norris argues that this "vague" statement could be interpreted to mean that Norris knew, for example, "he was driving without proper documentation," our standard of review means we will not speculate at possible innocent interpretations. We need consider only the inferences that are both reasonable and most favorable to the verdict, which, in this case, suggest Norris believed the police were looking for him because he had just returned to his apartment and learned that it had been subjected to a police raid in which his drugs and gun had been seized.

Taken together, all of this evidence, and the prosecution-friendly inferences we must draw, provide sufficient basis for a rational factfinder to conclude that Norris exercised control over Bedroom 1 and its closet (and therefore, either by himself or jointly with Brown, the gun and drugs) in the period immediately leading up to the search.

Finally, as discussed above, the jury was permissibly instructed that possession includes joint possession, so it could have permissibly resolved any ambiguity about Brown's use of the room, including from her statement to Lora about owning a gun, by finding that the she and Norris jointly exercised control over the contraband.

## c.

We next take up Norris's claim that the district court erroneously admitted as lay opinion law enforcement officers'

testimony that several items found in Apartment 2A -- including plastic sandwich bags, digital scales, and the Brick Press hydraulic system -- were tools of the drug trade. Detective Donahue testified that digital scales are "utilized basically by narcotics distributors to basically weigh smaller amounts of narcotics and . . . [t]hey're weighed when they're breaking it down into smaller amounts of narcotics, basically for street-level distribution." Detective Donahue provided similar testimony about drug distributors' use of plastic bags to prepare units for street-level sales.[6] Finally, Detectives Donahue and Mercurio each testified about the function of the Brick Press hydraulic system, including through attempted physical demonstrations for the jury.[7]

We assume without deciding that the district court's pretrial disposition of Norris's motion to exclude evidence based

_____

[6]  Specifically, Detective Donahue said:

> [In my] [t]raining and experience, I know that the drug distributors will utilize the plastic bags to basically package up the narcotics. They'll pour it into the corners of the plastic bag, tie a knot so it's a small little package, and then rip that corner with the substance in it from the bag, or they'll cut it from the bag so it's a smaller item. That way they can utilize it so it's easier to sell on the street, street-level distribution, and it's a smaller item to conceal from law enforcement.

[7]  Detective Donahue testified that:

> This would be part of a hydraulic press system. This is the main box, but there's

- 16 -

other parts that are involved too, and it's actually stated on it, "The Brick Press." . . . So this is just a partial of -- there's more components of this to a press. It's a hydraulic press system. And this actually on the tag here, above my initials and ID, it actually in small writing says "The Brick Press" on it.

Detective Mercurio's testimony about the Brick Press primarily included an attempt to assemble the components (presented here with the court's interjecting questions omitted):

So basically this is what is referred to as a base plate. The jack sits on top of the base plate. These screw into the base plate. (Witness demonstrating.) . . . This is notched so that it can fit onto the jack. These have holes. There would normally be four of these. These go into the hole. That goes over it in a perfect world. (Witness demonstrating.) This goes on top. . . . So that basically, so you have the base plate. You have the hydraulic jack. The hydraulic jack fits in the bottom of that. This goes on top. This wing nut would screw onto this nut. Pressure would be applied up, and it pushes it into the shape of a square. So basically that's how it works. . . . [Y]ou just use like a -- you need a screwdriver or something just to crank that. It applies pressure up. These wing nuts hold it down so that it compacts the items that are inside. . . . It's just hydraulic. . . . [The jack] pushes up through the bottom, and this plate that's in the bottom slides up through here, so it comes up further into this, and it pushes against this top plate. So it's not mechanical; it's just hydraulic. So you jack it up, and then you release it like a normal jack, so it just applies the pressure and pushes it into the shape. . . .

[Question from the prosecutor:] And what is it pushing into the shape?

on these same objections preserved the objections. Compare United States v. Almeida, 748 F.3d 41, 50 (1st Cir. 2014) (reviewing in limine rulings for plain error only, where the defendant "did not renew his objection to the challenged evidence at trial" and failed to argue that the rulings were "final rather than tentative"), with Rodriguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 35 (1st Cir. 2011) (finding a particular ruling in limine was "final enough" to render additional objections at trial unnecessary). Our review is thus for abuse of discretion. Señor Frog's, 642 F.3d at 35.

Substantively, Norris argues that the district court abused its discretion in failing to observe the requirements of Rule 702 (imposing heightened requirements for expert testimony) and permitting the officers' testimony under Rule 701, which provides that:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

---

[Answer:] I mean, it's commonly referred to as a kilo press to press powdered drugs into a brick form.

However, Norris acknowledges that we have previously upheld the admission of similar lay opinion testimony about drug distribution practices based on law enforcement experience and that the district court apparently relied on that precedent. See United States v. Moon, 802 F.3d 135, 147-48 (1st Cir. 2015) (upholding lay opinion testimony from law enforcement officer regarding drug dealers' frequent possession of firearms "to protect themselves and their drugs"); United States v. Valdivia, 680 F.3d 33, 50-51 (1st Cir. 2012) (same regarding drug traffickers' typical use of third parties' names in subscribing to cell phone services); United States v. Ayala-Pizarro, 407 F.3d 25, 29 (1st Cir. 2005) (same regarding heroin seized at drug points typically being packaged in "aluminum decks" like the ones found in that case).

Rather than attempt to distinguish our precedent, at least as to Detective Donahue's testimony, Norris instead argues that "the First Circuit's precedents permitting lay opinion testimony about drug distribution practices [are] based on an erroneous legal principle that is in conflict with the law in all other circuits." The government denies this is so. However, three-judge panels of our circuit are bound by prior panel decisions "closely on point," with only limited exceptions. United States v. Lopez, 890 F.3d 332, 339-40 (1st Cir. 2018). As Norris

has not argued that any such exception applies here, we decline to go looking for one.[8]

Norris does contend that, even if the scales-and-baggies testimony is governed by precedent, we should "draw the line" at Detective Mercurio's attempted demonstration of the Brick Press, because this testimony "purported to offer technical, specialized knowledge." But setting aside whatever level of technical knowledge may have been required for this testimony, Norris entirely fails to address the government's argument that any error from all of the challenged testimony was harmless in light of similar -- and, indeed, much more extensive -- expert testimony provided later in Norris's trial by Detective Thomas Keating. Cf. United States v. Pena, 910 F.3d 591, 599 (1st Cir. 2018) (finding that the defendant failed to show prejudice after assuming abuse-of-discretion review applied and that an evidentiary ruling was error).

Detective Keating was permitted to testify, without objection, not only to the function of scales and "cut baggies" in the drug trade, including the significance of residue found on scales, but also to the use of razor blades and credit cards to cut up cocaine, the street value of crack and powder cocaine in

---

[8] Norris appears to have presented this argument primarily to preserve a challenge to our precedent in a potential en banc proceeding.

Brockton, Massachusetts, and the import of the quantity of drugs found at Apartment 2A.  For example, Detective Keating testified, without objection, in the following exchange:

> Q.    Now, based on your training and experience, can you tell the jury whether, in your opinion, possession of 46 grams of cocaine base in a bag with a loaded gun, ammunition, and two digital scales is consistent with distribution or possession for personal use?
> A.  Distribution.
> Q.  And based on your training and experience, could you tell the jury whether, in your opinion, possession of 32 grams of powder cocaine in a bag with a loaded gun, ammunition, and two digital scales is consistent with distribution or possession for personal use?
> A.  Distribution.

Norris next argues in conclusory fashion that he was prejudiced by Detective Mercurio's testimony because, without the notice requirements for experts, he was not able to sufficiently prepare his defense.  But Norris makes no showing of what else he would have done with additional notice of the Brick Press demonstration testimony, and he <u>was</u> put on notice by the government's pretrial motions practice that someone would provide testimony about drug distribution practices.  Norris does not argue whether or how the jury's verdict could have turned on  the Brick Press demonstration rather than the testimony provided by Detective Keating, let alone how it was not harmless in light of the physical evidence (including the drugs themselves) recovered

from the apartment.  In the absence of such an argument, we see no basis to conclude that any possible error here was not harmless.

**D.**

We end with Norris's fourth category of claims, concerning the 18 U.S.C. § 922(g) felon-in-possession count.  In February 2019, Norris moved for a judgment of acquittal and a new trial under Federal Rules of Criminal Procedure 29 and 33.  In June 2019, the Supreme Court issued its decision in Rehaif, which held that a conviction under 18 U.S.C. § 922(g) requires the government to prove "both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."  139 S. Ct. at 2200. Norris then filed a supplemental memorandum arguing for a new trial on his section 922(g) count because that charge was not supported by sufficient evidence that Norris knew of his status and because the jury had not been instructed to find this element.  On appeal, Norris supplements this claim by arguing that the indictment failed to allege the knowledge-of-status element.

As Norris raised his Rehaif claims for the first time in a motion for a new trial or thereafter, we review only for plain error.  See United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010) (citing United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008)); see also United States v. Burghardt, 939 F.3d 397, 402 (1st Cir. 2019) (observing that even arguments that "become

available only as a result of intervening changes in law" can be waived (quoting United States v. Sevilla-Oyola, 770 F.3d 1, 14 (1st Cir. 2014))).  It matters not that Norris's original Rule 29 motion did argue that the evidence was insufficient, as he raised only other bases for that challenge.  See United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) ("[W]hen a defendant chooses only to give specific grounds for a Rule 29 motion, all grounds not specified are considered waived and are reviewed under [the] less forgiving 'clear and gross injustice' standard.").

To demonstrate plain error, "a defendant must show '(1) an error, (2) that is clear or obvious, (3) which affects his substantial rights . . . , and which (4) seriously impugns the fairness, integrity or public reputation of the proceeding.'" Burghardt, 939 F.3d at 403 (alteration in original) (quoting United States v. Correa-Osorio, 784 F.3d 11, 17–18 (1st Cir. 2015)).  This standard of review, and the third prong in particular, proves fatal to Norris's Rehaif-based challenges.

In Greer v. United States, issued during the briefing of this appeal, the Supreme Court confirmed that the substantial-rights prong places the burden on the defendant to show "that, but for the Rehaif error, the outcome of the district court proceedings would have been different."  141 S. Ct. 2090, 2097 (2021).  Greer held that being a felon strongly implies knowing one is a felon, and hence, a defendant will fail the third prong of plain-error

review for Rehaif-based claims unless he shows on appeal that "he would have presented evidence in the district court that he did not in fact know he was a felon." Id.; see also Burghardt, 939 F.3d at 403-04 (same). Moreover, the Court held that "an appellate court conducting plain-error review may consider the entire record -- not just the record from the particular proceeding where the [alleged] error occurred." Id. at 2098.

Greer specifically addressed challenges to one court's failure to instruct the jury that it needed to find the knowledge-of-status element and to another court's failure to advise a defendant on the element during his plea colloquy. Id. at 2096. We also consider under Greer's purview Norris's challenges to the indictment and to the sufficiency of the evidence of the knowledge-of-status element. See United States v. Lara, 970 F.3d 68, 84-86 (1st Cir. 2020) (considering unpreserved Rehaif-based challenges to the sufficiency of an indictment and of the evidence under forms of plain-error review, with the latter challenge reviewed for "clear and gross injustice" -- a "particularly exacting variant" (quoting United States v. Valenzuela, 849 F.3d 477, 484 (1st Cir. 2017))).

Accordingly, here, as in Greer, we may properly examine "relevant and reliable information from the entire record -- including information contained in a pre-sentence report." 141 S. Ct. at 2098. Norris's PSR indicates that he had previously

- 24 -

received sentences of seven-to-nine years and four-to-five years of imprisonment. It would require something quite extraordinary to show that a person having received such sentences did not know a sentence in excess of one year was possible. Norris offers no such extraordinary proof or argument.

Norris's reply brief concedes "that [after Greer] his claims of error based on the failures of trial proof and omission of the element from the jury instructions would alone not warrant relief under Rehaif."[9] However, he continues to press the claim that the insufficiency of his indictment merits dismissal of the section 922(g) count. Specifically, he argues that he need not show prejudice because this error is "structural." It is structural, he says, because it infringed his Fifth Amendment right to be indicted by a grand jury and his Sixth Amendment right to notice of the accusation against him. We have already considered this precise challenge in Lara, where we declined to decide whether the sufficiency of an indictment was structural because, even if it were, unpreserved structural errors are nonetheless subject to plain-error review. 970 F.3d at 86 (citing Johnson v. United States, 520 U.S. 461, 466 (1997)).

---

[9] As Norris has apparently abandoned any argument that the proof at trial was insufficient to prove the knowledge-of-status element, we need not consider his prior argument that the stipulation to his felon status could not alone provide sufficient evidence on this element.

To be sure, we did not decide whether the insufficient indictment in Lara affected the defendant's substantial rights. We instead decided the appeal on the fourth prong of plain error, reasoning that the error did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings" because "the evidence that the element that was omitted ha[d] been satisfied [wa]s nevertheless 'overwhelming and essentially uncontroverted.'" Id. at 88 (quoting United States v. Cotton, 535 U.S. 625, 633 (2002) (internal quotation marks omitted)). And Norris points out that the indictment in Lara specified the defendant's past crimes of conviction, a detail absent from Norris's indictment. Id. at 87-88. True enough, but these are distinctions without a difference for Norris. In resolving the challenge there on plain error's fourth prong, we relied not on the prior conviction details within the indictment's four corners, but on the same bases that the Supreme Court in Greer invoked for the substantial-rights prong: We looked to evidence outside of the trial record that demonstrated the defendant's presumptive awareness of his past convictions, and we observed that the defendant failed to "develop any argument as to how the lack of notice stemming from the omitted knowledge-of-status element mattered, given this evidence of his prior criminal history." Id. at 88.

In short, Norris has made no showing that the Rehaif-based errors in his indictment, evidence, and jury instructions affected the outcome of his proceedings, and he has identified no distinction from Greer and Lara that would permit us to grant relief without such a showing.

**III.**

For the foregoing reasons, the judgment of the district court is **affirmed**.

**- Concurring Opinion Follows -**

**THOMPSON, Circuit Judge, concurring in the judgment.** I agree with most of the Court's conclusion. But I disagree that the district court was in the right to have given--over Norris's objection--a jury instruction on joint possession. To reach its result, the Court shimmies past our clear case law reminding district courts that jury instructions should be based not on what the "standard charge" is, but what instructions fit based on the facts and theories of the case. And instead, the Court stretches other of our case law far beyond what it actually stands for. In doing so, the Court opens the door to government windfalls in the form of jury instructions justifying alternative routes to conviction that the government not only didn't argue, but expressly disavowed. Because I would conclude that instructional error was nonetheless harmless in this case, though, I respectfully concur in the judgment.

### A.

In United States v. Ramos-González, 775 F.3d 483 (1st Cir. 2015), we concluded that the district court erred when it delivered a joint-possession jury instruction where "the record contain[ed] no evidence of such a theory, and no party argued it," id. at 499. We suspected the district court there delivered the joint-possession instruction "unthinkingly" and "simply because it is part of the boilerplate jury charge on possession with intent to distribute a controlled substance." Id. So we admonished the

- 28 -

district courts to take care in delivering jury instructions. "[B]oilerplate instructions," we said, "should not be used without careful consideration being given to their applicability to the facts and theories of the specific case being tried." Id. (quoting United States v. Wolak, 923 F.2d 1193, 1198 (6th Cir. 1991)).

The government here does not dispute that it never argued for a theory of joint possession below. Indeed, the government expressly disavowed the contention that Brown had anything to do with the contraband. (I'll get back to that in more detail in just a bit.) That fact notwithstanding, the Court shoves away Ramos-González because, it says, the facts there "left no room for a joint-possession theory." Ante at 12. According to my colleagues, that is so because the defendant presented an either-or situation when he raised an alibi defense that someone else was driving the truck containing the contraband when it was stopped by police.[10] Id. But the traffic-stopped truck was also owned by the defendant. Ramos-González, 775 F.3d at 487. So, based on the district court's thin theory of joint possession here--i.e., merely that Brown was "in that bedroom . . . most of the time," ante at 12--the facts in Ramos-González, too, could have supposedly justified a joint-possession theory: the jury could have believed

---

[10] The driver of the vehicle fled on foot and escaped. Ramos-González, 775 F.3d at 488. Police later IDed the defendant as the driver. Id.

the government that the defendant owned the truck; it could have believed the defendant that he was not the driver on the day; but it still could have believed that the defendant was somehow involved.[11] Ramos-González thus presents the same hypothetical jury-could-believe-some-but-not-all justification for a joint-possession instruction as the Court says exists here. Yet we said that the joint-possession instruction in Ramos-González was not proper because "the record contains no evidence of such a theory, and no party argued it." 775 F.3d at 499.[12]

Ramos-González out of the way, the Court thinks that the instructions lined up with the facts of the case here because, it says, Norris opened the door to a joint-possession theory. He did so, the Court explains, because his theory of defense was that the contraband wasn't his--it was Nakaita Brown's, who also lived in the bedroom where the contraband was found. That follows, my

_____

[11] The government in Ramos-González also presented evidence from an FBI agent that, in his experience, the behavior at the defendant's residence reflected likely gang activity. Tr. of Jury Trial at 22:12-23:3, United States v. Ramos-González, No. 3:07-cr-00262 (D.P.R. Mar. 18, 2012), ECF No. 221; see also Tr. of Jury Trial at 89:10-21, Ramos-González, No. 3:07-cr-00262 (D.P.R. June 10, 2012), ECF No. 242 (emphasizing the same at closing argument).

[12] The district court in Ramos-González instructed the jury that it could not find that the defendant possessed the cocaine if it did not believe he was there. Id. at 498-99. We have no idea how that meshed with a joint-possession instruction, though, because the defendant didn't object below (so the government never defended it), and the government defended it on appeal only on the ground that it was harmless where the evidence supported the sole-possession theory.

colleagues say, even though the government not only admits that it never suggested that Brown had any involvement with the gun or drugs, the government also repeatedly rejected any such inference. Indeed, it went to lengths in its closing argument to deflect any possibility that Brown was a co-possessor of the contraband.  To highlight just a few instances from closing arguments:

- "In any event, the evidence in the case shows that [Brown is] not the person who possessed the firearm in the backpack, that loaded .9 millimeter pistol, because the person who was in possession of that firearm is the same person who possessed in that same backpack 46 grams of crack cocaine and possessed over 30 grams of powder cocaine, all with the intent to distribute it, and I suggest it's clearly not Nakasha [sic] Brown."

- "[Norris is] trying to say [Brown's] the one who's cutting stuff up dealing drugs, et cetera, et cetera. How was she doing that exactly if she's in the apartment all the time with a kid?  She's not dealing drugs in the apartment.  I mean, that's crazy."

- "There's absolutely no evidence that she's dealing drugs . . . ."

- "[Brown is] not the one who's dealing drugs.  Who's the one who is in and out of that apartment during the time the two of them [are] there?  It's not her. It's him, the defendant."

- "The evidence shows you beyond any reasonable doubt that he is the one who possessed the stuff in the closet, that he is the one who possessed that firearm in the bag, he is the one who possessed the crack cocaine in the bag, he is the one who possessed the powder cocaine in the bag, he is the one who possessed the crack and powder in that box above the sink, and he is the one who possessed that gun in the bag in furtherance of his drug-trafficking activity, and once again we ask you to find him guilty accordingly."

- 31 -

So the government's theory was not just that Norris alone possessed the contraband--it was also specifically that Brown didn't.[13]

The government's contrary theory of the case "matters not" to the Court. Ante at 11. Relying on United States v. Howard, 687 F.3d 13 (1st Cir. 2012), the Court notes that "[w]hen crafting jury instructions a judge must consider all of the evidence introduced at trial, in other words, the government's as well as the defense's," id. at 19. That's true. We also concluded in Howard that the defense opened the door to a joint-possession instruction through his evidence and arguments. The Howard defendant argued that he didn't possess the contraband--it was someone else. This is also true.

But, even recognizing those truths, Howard doesn't stretch as far as the Court tries. In Howard, the government explicitly argued a joint-possession theory as an alternative. To be sure, its primary theory of the case was that Howard possessed the contraband alone. Yet it also expressly told the jury that "to the extent that Deshawn Howard was working that business with someone else, listen to the judge's instruction on joint possession. Mr. Howard doesn't have to be the only person possessing it." Tr. of Criminal Jury Trial, Day 5 at 21:20-23,

---

[13] The government also told the district court that it thought Brown would have no "colorable" Fifth Amendment claim if she were called to testify at trial because it did not "have any reason to believe she possessed that gun or the drugs."

United States v. Howard, No. 3:09-cr-30027 (D. Mass. Aug. 23, 2011), ECF No. 90; see also id. at 41:23-42:7 ("If Deshawn Howard, with regard to the possession and distributing the five or more grams of cocaine, is working with anyone else . . . then he's culpable just as if he acted alone.  But it's his drugs and his scales and his gun.").

So it's not just that Howard's evidence raised a possible inference that he was "in cahoots" with the two residents of the home--the government also picked up on that possible inference as an alternative theory.  See, e.g., United States v. Appolon, 695 F.3d 44, 64 (1st Cir. 2012) (rejecting contention that the government's argument of actual knowledge forfeits the government's right to present a willful-blindness instruction). Which, as I've already explained, is far from what happened here. Far from lining up with Howard, the joint-possession instruction here instead gave the jury the opportunity to convict Norris on a theory the government never proposed--and one it even called "crazy."

Searching far and wide for evidence that the government pressed a joint-possession theory here, my colleagues pluck a singular reference by the government in its closing statement that possession could be joint.  What my colleagues don't note, though, is that statement came merely in the government's description of the legal definition of possession, including what it means for

possession to be actual or constructive.  Nor do they mention the context of the government's one-sentence remark:  It came just before the government dove into an extended monologue, which we already reviewed, telling the jury that Brown had nothing to do with the contraband at issue.  On top of that, my colleagues cannot "retrieve[] and mine[]" a single instance in this record in which the government attempted, beyond a passing mention to a legal definition of possession, to present a joint-possession theory.  So the issue is not, as my colleagues attempt to frame it, that the government took "inconsistent" positions or "abandoned its fallback position."  Ante at 11 n.5.  The problem is that the government simply never presented an alternative theory.

Presumably, the government had good reason to tell the jury repeatedly that Brown had nothing to do with the gun or drugs found here.  If that was the government's belief, it should not have had the benefit of giving the jurors an easy out to resolve the conflict between Norris's allegations against Brown and the government's clear insistence that Brown was not involved.  See Wolak, 923 F.2d at 1198 (finding error in joint-possession and constructive-possession instructions because neither "was an issue in this case . . . as the government's theory was that Wolak had actual possession of the firearm at all relevant times, and the defense theory was that the gun belonged to Pruitt").

How the instruction made it to the jury in the first place also reveals the error of the district court's way. The government put the instruction on its proposed list months before trial, without explanation. At trial, Norris objected. Yet the district court treated the joint-possession instruction as an almost pro forma matter:

> [Norris's counsel]: [T]he one that's more, I guess, pressing would be the one that there could be joint possession. I'd like to argue that some because I don't think that's the government's case, and I don't think --
>
> THE COURT: That's a standard instruction. Do you want it?
>
> [Government's counsel]: Yes.

When the district court--not the government--began to explain the supposed evidentiary basis for the instruction, Norris's counsel tried to jump in. But the district court again cut him off:

> THE COURT: I think that is the case actually. I mean, you've presented an excellent picture, actually, that she was in that bedroom, and she was in there most of the time, so --
>
> [Norris's counsel]: But they haven't argued that she was part -- working with him in any way, and the police chose to truncate their investigation because they said she wasn't --
>
> THE COURT: That's your case. I get it. I will be giving a joint instruction charge if you want, if you're looking for that.
>
> [Government's counsel]: Yes.

The district court did not even allow Norris's counsel to finish his argument about why the instruction was inappropriate. Indeed,

- 35 -

the government offered no justification of its own for the charge.[14] The district court simply reverted back to the fact that it was a "standard instruction." Which goes directly against Ramos-González.[15]

In sum, rather than tailor the instructions to the facts and theories of the case, the district court relied on both the ubiquity of the instruction and its own--not the government's--explanation of the joint-possession theory. In doing so, the

_____

[14] In United States v. Sweeney, 887 F.3d 529, 540 (1st Cir. 2018), we relied on Howard to conclude that the defendant's suggestion that someone else in the residence used the password-protected computer account to share child pornography allowed for an aiding-and-abetting instruction to be delivered. We said so because the evidence could have suggested that the defendant gave the password to someone else to use. Id. But the government in Sweeney argued this theory to the court in defending the aiding-and-abetting instruction. See Tr. of Jury Trial Day 6 at 6-102:14-6-103:2, United States v. Sweeney, No. 4:15-cr-40033 (D. Mass. June 30, 2017), ECF No. 188. The government made no such argument here, at least in part because the district court speculated on the government's behalf.

[15] I am also dubious about the district court's suggestion that the mere fact that someone else used the bedroom where the contraband was found would be, alone, sufficient to justify a joint-possession instruction where the government never argued it. Though I acknowledge that some of our sister circuits have set such a low bar. See, e.g., United States v. Driggers, 913 F.3d 655, 657–58 (7th Cir. 2019) ("Indeed, we have gone so far as to say that 'a joint possession instruction is "necessary" when contraband is recovered from a jointly-occupied residence.'" (quoting United States v. Rainone, 816 F.3d 490, 494 (7th Cir. 2016))); Johnson v. United States, 506 F.2d 640, 643–44 (8th Cir. 1974) (approving of joint-possession instruction where "the events took place in an apartment which Johnson shared with his sister as well as because Jones was present and had access to the drugs"). Indeed, in justifying the instruction on appeal, my colleagues look to a slew of other evidence. Ante at 10.

- 36 -

district court offered the government a helping hand to conviction, permitting the government a jury instruction on a theory it never presented.  And that, on a general level, creates too great a danger of confusing the jury or sandbagging the defense.  I see no good reason to open the door to conviction based on a theory the government expressly disavowed.

### B.

The instructional error notwithstanding, I would still affirm the conviction because the error was harmless.  See United States v. McLellan, 959 F.3d 442, 466 (1st Cir. 2020) (noting that improper jury instructions "would not warrant overturning the conviction if the potential error in the jury instruction were harmless").  Our harmless-error analysis in criminal cases proceeds at one of two levels.  "The stricter standard, applicable mainly to issues of constitutional dimension, requires the government to prove beyond a reasonable doubt that the error did not influence the verdict."  United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012).  "The less stringent standard, applicable mainly to trial errors that are not of constitutional dimension, allows a conviction to stand, error notwithstanding, as long as it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"  Id. (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).  Neither

party argues what harmless-error standard applies.  I will assume, favorably to Norris, that the more-stringent standard applies.

"Where a potentially erroneous instruction deals with an essential element of the crime, it is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  McLellan, 959 F.3d at 466 (cleaned up).  "A jury instruction error is not harmless if 'the record contains evidence that could rationally lead to a contrary finding' in the absence of the error."  United States v. Ford, 821 F.3d 63, 68 (1st Cir. 2016) (quoting United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008)).  Thus, an instructional error "on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element."  McLellan, 959 F.3d at 466 (quoting United States v. Doherty, 867 F.2d 47, 58 (1st Cir. 1989)).

Though the government does not argue that the error was harmless, we have exercised our discretion to overlook the government's failure to do so in the past.  See, e.g., United States v. Rose, 104 F.3d 1408, 1415 (1st Cir. 1997).  We have reasoned that "[i]n a case of clearly harmless error it would be a waste of judicial resources to require a new trial where the result is likely to be the same."  United States v. Rodriguez Cortes, 949 F.2d 532, 543 (1st Cir. 1991).  Figuring out whether

- 38 -

we should overlook the error "involves the balancing of many elements," including "the state of the record and whether the arguments that the government does make provide assistance to the court on the harmlessness issue."  Rose, 104 F.3d at 1415.

I think we can overlook the waiver here because, though the jury should not have received a joint-possession instruction, its potential reliance on that instruction clearly did not make the conviction infirm.  The court instructed the jury on both actual and constructive possession.  (Constructive possession was the government's theory.)  The court went on:  "Possession also includes both sole possession and joint possession.  If one person alone has actual or constructive possession, the possession is sole.  If two or more persons share actual or constructive possession, possession is joint."  Thus, even if the jury found that Norris jointly possessed the contraband with another person, it still would have concluded that he actually or constructively possessed the contraband.  Which, alone, is sufficient to convict him of the counts in the indictment.[16]  See 18 U.S.C. § 922(g)(1);

_____

[16] For that reason, Norris's contention that the late-breaking joint-possession instruction deprived him of the ability to "question witnesses in a way that undermined the theory of liability" and "the opportunity to mount his own arguments and defenses against it" does not convince me.  His defense of pointing the finger at Brown would have knocked out two birds with one stone, since it tried to get the jury to find that Norris neither actually nor constructively possessed the contraband.  If Norris proved he had nothing to do with the contraband, then the jury could not have found that he was in cahoots with Brown.

21 U.S.C. § 841(a)(1); <u>United States</u> v. <u>Tanco-Baez</u>, 942 F.3d 7, 25 (1st Cir. 2019) (noting that possession for § 922(g) can be sole or joint); <u>United States</u> v. <u>Maldonado</u>, 23 F.3d 4, 6-7 (1st Cir. 1994) (same for § 841). And, as the Court thoughtfully explains, there was sufficient evidence for the jury to convict Norris of possessing the contraband at issue.

\* \* \*

The district court erred in delivering a jury instruction on a theory of the case the government not only did not argue, but expressly denied. Though it turned out harmless here, there will certainly be some cases where such instructions launch the jury into a pit of confusion, risk convictions by speculation, and potentially sandbag the defense after it has no more opportunity to pursue a different strategy. For that reason, I respectfully concur only in the judgment.